**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

------------------------------------------------------------- **X**

**IN RE YASMIN AND YAZ**
**(DROSPIRENONE) MARKETING,**
**SALES PRACTICES AND PRODUCTS**
**LIABILITY LITIGATION**

**3:09-md-02100-DRH-PMF**

**MDL No. 2100**

**ORDER**

-------------------------------------------------------------
**This document relates to:**

*Frances Burns v. Bayer Healthcare*
*Pharmaceuticals, Inc.* **Case No. 3:09-**
**cv-20001-DRH-PMF**

# ORDER

## I. INTRODUCTION

## Herndon, Chief Judge:

This matter is before the Court on plaintiff's motion for an order certifying this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure (Doc. 54). Plaintiff is seeking an order granting class action status to a class comprised of California consumers who were allegedly harmed as a result of purchasing YAZ. Plaintiff is not alleging any physical injury from ingesting YAZ. Rather, plaintiff asserts that purchasing YAZ caused her to suffer an economic harm. Plaintiff contends that she selected YAZ as an oral contraceptive, as opposed to selecting an equally effective cheaper oral contraceptive, in reliance on one or more direct-to-consumer advertisements containing material omissions regarding the limitations and/or approved uses of YAZ.

Having considered the parties briefs and the relevant authority, the Court finds that plaintiff cannot meet all of the requirements of Rule 23. Accordingly, for the reasons discussed herein, the Court **DENIES** plaintiff's motion for class certification and **STRIKES** the class allegations in plaintiff's second amended complaint (Doc. 52).

## II. BACKGROUND

### A. Factual Background

Bayer markets and sells consumer health products and pharmaceutical products, including YAZ. YAZ is a member of a class of prescription medicines known as combined hormonal oral contraceptives ("COCs") which consist of estrogen and progestin (Doc. 56 p. 4). The estrogen in YAZ is ethinyl estradiol and the progestin is drospirenone (Doc. 56 p. 4).

The Food and Drug Administration ("FDA") approved YAZ as an oral contraceptive in March of 2006. *Id*. The FDA subsequently approved YAZ as a treatment for moderate acne vulgaris in women who choose to use an oral contraceptive and as a treatment for premenstrual dysphoric disorder ("PMDD") in women who choose to use an oral contraceptive. *Id*. To date, YAZ has not been approved for the treatment of premenstrual syndrome ("PMS") or premenstrual symptoms not severe enough to warrant a diagnosis of PMDD.

PMDD is a condition associated with severe emotional and physical problems that are closely linked to the menstrual cycle. PMDD and PMS share some common symptoms, such as depression, anxiety, tension, irritability,

moodiness, headaches, and breast tenderness. PMDD is distinguished from PMS (and Premenstrual Symptoms) based on the number and the severity of symptoms experienced. Women with PMDD, suffer from a larger number of symptoms than women who have PMS or who experience premenstrual symptoms. In addition, the symptoms associated with PMDD are severe enough to markedly interfere with work, school, social activities and/or relationships.

PMDD affects a relatively small percentage of women (3%-8%)[1] when compared to the percentage of women who suffer from premenstrual symptoms (70%-90%)[2] or PMS (estimates vary widely, most ranging from 20%-40%).[3] Studies indicate that the majority of women experiencing premenstrual symptoms do not seek any medical treatment for them (Doc. 56 p. 4 n.1; Doc. 54-2, Exhibit I

---

[1] Plaintiff contends that PMDD affects roughly 4-5% of women (Doc. 54-1 pp. 11-12). A study cited by the defendant indicates that 3%-8% of women suffer from PMDD (Doc. 56-3 pp. 2-3).

[2] Plaintiff contends that premenstrual symptoms affect roughly 75% of women (Doc. 54-1 pp. 11-12). Studies included in the parties' briefing reflect similar estimates (*See e.g.*, Doc. 56-3 pp. 2-3 (reporting that 70%-90% of menstruating women have some degree of premenstrual symptoms); Doc. 54-2, Exhibit I, p. 3 ("The prevalence of premenstrual symptoms has been estimated to be as high as 75% of all women with a menstrual cycle")).

[3] Plaintiff contends that PMS affects roughly 85% of women (Doc. 54-1 pp. 11-12). However, the scientific material included in the parties' briefing more commonly indicate that, while estimates vary widely, the range of women suffering from PMS is approximately 20-40% (*See e.g.,* Doc. 56-3 pp. 2-3 ("70%-90% of menstruating women have some degree of [premenstrual symptoms] before menses with 20%-40% describing them as bothersome enough to impair daily functioning and classified as PMS."); Doc. 54-2, Exhibit I, p. 3 (reporting that 20% of women have symptoms consistent with PMS); Doc. 54-2, Exhibit J, p. 2 (40% of menstruating women report some symptoms of PMS)). An article published by the National Women's Health Information Center and attached as an exhibit to plaintiff's motion for class certification states that 85% of menstruating women have at least one PMS symptom as part of their monthly cycle (Doc. 54-2, Exhibit K, p. 2).

p. 23 (76% did not seek treatment with 60% stating that symptoms were not severe enough to warrant treatment).[4]  Studies also indicate that, for a majority of women suffering from PMS, symptoms are mild and do not require treatment (*See e.g.*, Doc. 54-2, Exhibit K, p. 2; Doc. 54-2, Exhibit J, p. 2; Doc. 56-3 p. 3 (estimating that 13%-18% of women suffering from PMS would benefit from medical treatment "because of symptom severity that is clinically relevant even though they do not meet the minimum number of symptoms required in the DSM IV TR to meet the classification for PMDD")).

For those women who require treatment for PMDD or PMS, doctors sometimes prescribe oral contraceptives to stop ovulation from occurring (Doc. 54-2, Exhibit H, p. 1581; Doc. 54-2, Exhibit K, p. 2; Doc. 54-2, Exhibit J, p. 2; Doc. 56-3 p. 12).   Certain oral contraceptives, however, have shown mixed effectiveness and, in some instances, worsening of symptoms (Doc. 56-3 p. 12).[5] Other than oral contraceptives, a wide range of treatments are used to treat premenstrual symptoms, PMS, and/or PMDD, including diet and exercise, over-the-counter  and  prescription  pain  relievers,  prescription  muscle  relaxers,

---

[4]  One study found that 74% of women with premenstrual symptoms did not seek medical treatment (Doc. 54-2, Exhibit I, p. 23).   Of those who did not seek medical treatment, 60% stated that symptoms were not severe enough, 12% did not think anything could help, 12% found other ways to treat, 7% stated that it was just part of being a woman, and 9% had other reasons.  *Id*.  The National Women's Health Information Center estimates that 40% of women have *some* symptoms of PMS but "[m]ost of these women have symptoms that are fairly mild and do not need treatment"  (Doc. 54-2, Exhibit J, p. 2).

[5]  The class representative, Ms. Burns, told her doctors that Ortho Tri-Cyclen, Ortho-Cyclen, Lo/Ovral and Low-Ogestrel exacerbated her PMS symptoms (Doc. 56-2 pp. 34-35, 43).

antidepressants, hormonal therapies, anti-anxiety medication, vitamins, SSRIs, and Tricyclics (Doc. 54-2, Exhibit I, pp. 27-41; Doc. 54-2, Exhibit K, pp. 2-3). The National Women's Health Information Center states that "[n]o treatment works for every woman, so [women] may need to try different ones to see what works" (Doc. 54-2, Exhibit K, p. 2).

## B. Allegedly Fraudulent Advertisements

Plaintiff contends that "Not Gonna Take It" and "Balloons," two television commercials aired by the defendant during the class period, contained material omissions and/or misrepresentations.[6] Specifically, plaintiff claims that the

---

[6] In her briefing, plaintiff contends that her claims are based only on an alleged material *omission* and not on any affirmative *misrepresentations* (*See e.g.,* Doc. 73 p. 2). However, a central element of plaintiff's claims is that representations referencing generic symptoms such as "bloating" and "moodiness" were misleading because such symptoms may be associated with PMS, PMDD, and/or premenstrual symptoms. Plaintiff's complaint also indicates that her claims are based on both alleged omissions and misrepresentations (*See* Doc. 52 p. 21 ("Defendant's Ads sought to fraudulently depict YAZ as being approved for, and/or shown effective in, curing, treating, and/or mitigating PMS and Premenstrual Symptoms."); Doc. 52 p. 24 (referencing "Defendant's representation that YAZ" was approved for treatment of PMS and Premenstrual Symptoms); Doc. 52 p. 26-27 (alleging that defendant sold its product "under the deceitful guise that YAZ is approved for, and/or proven effective in, curing, treating, and/or mitigating PMS and Premenstrual Symptoms")). The Court finds that plaintiff's claims are based on omissions and misrepresentations. Whether couched as omissions or misrepresentations, the false advertising alleged by the plaintiff is actionable. *See Kasky v. Nike, Inc.*, 45 P.3d 243, 250 (Cal. 2002) (California consumer protection statutes "prohibit not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public."). For an omission to be actionable under the relevant consumer protection statutes it must be either (1) "contrary to a representation actually made by the defendant" or (2) a "fact the defendant was obligated to disclose." *Daugherty v. Am. Honda Motor Co., Inc.*, 51 Cal. Rptr. 3d 118, 126-127 (Cal. Ct. App. 2006). Plaintiff has not addressed either standard in her briefing.

disputed advertisements failed to disclose the fact that YAZ was neither approved for nor shown effective in treating, curing, and/or mitigating PMS or premenstrual Symptoms. Plaintiff also contends, that the advertisements references to generic symptoms associated with premenstrual symptoms, PMS, and PMDD were misleading.

In the first commercial, "Not Gonna Take It," women can be heard singing "We're Not Gonna Take It" while they kick, punch, and push words that describe symptoms such as "irritability," "moodiness," "bloating," and "feeling anxious" away from the screen (Doc. 54-2, Exhibit A). During the commercial, an announcer makes the following statements:

> "We all know that birth control pills are 99% effective and can give you shorter, lighter periods. But did you know there's a Pill that could do more? Now there's a Pill that goes beyond the rest. It's YAZ! And there's no other birth control like it. It can also help keep your skin clear."

> "YAZ is the ONLY birth control proven to treat the emotional and physical premenstrual symptoms that are severe enough to impact your life."

(Doc. 54-2 Exhibit A). This commercial was broadcast from August 20, 2007 to August 10, 2008 (Doc. 54-2, Exhibit C p. 12).

The second commercial, "Balloons," ran from May 20, 2008 to October 5, 2008 (Doc. 54-2, Exhibit D). Throughout the commercial, balloons with the words "irritability," "moodiness," "feeling anxious," "bloating," "fatigue," "muscle aches," and "headaches" can be seen while the song "Goodbye to You" plays in the

background (Doc. 54-2, Exhibit D).   In addition, an announcer makes the following statements:

> "YAZ is the only birth control proven to treat the emotional and physical premenstrual symptoms that are severe enough to impact your life"

> "All birth control pills are 99% effective and can give you shorter, lighter periods.  But there's one Pill that goes beyond the rest.  It's YAZ.  The Pill more and more women are turning to."

*Id.*

## C.  Third Direct-To-Consumer Advertisement: "Nightclub Commercial"

A third direct-to-consumer television advertisement was broadcast during the class period (Doc. 56 pp. 6-7).   This advertisement is known as "Three Women PMDD" and started airing in February 2007.   The commercial involved three women discussing YAZ in a nightclub (Doc. 56-13).   The advertisement expressly distinguished PMDD from PMS (doc. 56-13). One character in the commercial said:   "I thought I had PMS, so I tracked my symptoms and my doctor told me, 'That's not PMS, that's PMDD.'" (Doc. 56-13).   Another character responded saying, "Unlike PMS, symptoms of PMDD are severe enough to actually interfere with your life." (Doc. 56-13).   Plaintiff does not assert that this advertisement was deceptive.

## D.  FDA Warning Letter

On October 3, 2008, the FDA issued a warning letter to Bayer criticizing "Balloons" and "Not Gonna Take It" (Doc. 52-2).   Both commercials were

criticized on the ground that they did not distinguish clearly enough between PMDD and PMS[7] (Doc. 56 p. 5).  Specifically, the FDA stated:

> The TV Ads misleadingly suggest that YAZ is effective in a broader range of patients and conditions than has been demonstrated by substantial evidence or substantial clinical experience.  Specifically, given the overlap in certain symptoms between premenstrual syndrome (PMS) and PMDD, and the material limitation on YAZ's PMDD indication (that it has not been evaluated for the treatment of the less serious condition, PMS), the TV Ads misleadingly suggest that YAZ is appropriate for treating women with PMS, who may not be appropriate candidates for this drug.  We note that despite listing certain symptoms of PMDD, nowhere do the TV Ads use the full phrase "premenstrual dysphoric disorder," to more completely distinguish PMDD from PMS, thereby increasing the likelihood that a viewer, in light of the claims and presentations described below, will understand it to be the same as, or substantially similar, to PMS.

(Doc. 52-2).  After receiving this warning letter, Bayer asserts that it embarked on a twenty million dollar corrective campaign (Doc. 56 p. 5).

## E.  Asserted Claims

Plaintiff asserts claims under California's fraudulent concealment statute codified at California Civil Code §§ 1709 and 1710; Consumer Legal Remedes Act ("CLRA"), codified at Cal. Civil Code § 1750, *et seq.*; False Advertising Law ("FAL"), codified at Cal. Civil Code § 17500, *et seq.*; and Unfair Competition Law ("UCL"),[8] codified at Cal. Bus.  Prof. Code § 17200, *et seq.* (Doc. 52 ¶¶ 65, 77, 84,

---

[7]    The advertisements were also subject to criticism for failing to adequately distinguish between moderate and other forms of acne (Doc. 56 p. 5).  Plaintiff's claims, however, focuses on PMDD/PMS.

[8]    Liability under the UCL may be based on unlawful, unfair, or fraudulent business practices and/or on a violation of the FAL.  Cal. Bus. Prof. Code § 17200.  Each prong of the UCL has a separate standard for establishing liability.  *See*

87).  Plaintiff seeks restitution, compensatory damages, punitive damages and injunctive relief (Doc. 52 at Prayer for Relief).[9]

Plaintiff contends, had the putative class members not been deceived by the allegedly fraudulent advertisements, they would have purchased an equally effective and cheaper oral contraceptive.  Plaintiff theorizes that Bayer intentionally misled consumers because it did not want the market for YAZ to be limited to the relatively small subset of oral contraceptive users affected by PMDD (Doc. 54-1 pp. 3-10).  Instead, plaintiff contends, Bayer decided to promote YAZ as an approved and effective treatment for conditions or symptoms that are estimated to affect a greater number of potential users, namely PMS, and/or premenstrual symptoms not severe enough to warrant a diagnosis of PMDD (Doc. 54-1 pp. 3-10).  This alleged deception purportedly increased demand for YAZ

---

*South Bay Chevrolet v. General Motors Acceptance Corp.,* 85 Cal. Rptr. 2d 301, 310-318 (Cal. Ct. App. 1999).  Plaintiff's Second Amended Complaint states that her UCL claim is based on unlawful (including a violation of the FAL), unfair, and/or fraudulent business practices (Doc. 52 pp. 26-27).  However, plaintiff's briefing only addresses the "fraudulent" prong of her UCL claim.  Accordingly, the Court limits its UCL discussion to the fraudulent prong of the UCL.  Further, plaintiff's "unlawful" claim is based on alleged violations of the CLRA, the FAL, and the fraudulent concealment statute (Doc. 52 p. 27).  The Court addresses the alleged violations of these statutes separately.

[9]  As noted by defendants, plaintiff's complaint purports to seek injunctive relief.  Plaintiff, however, has not sought class certification on that basis under Rule 23(b)(2).  Nor could plaintiff obtain certification on that basis, because her primary claim is monetary.  *Lemon v. Int'l Union of Operating* Eng'rs, 216 F.3d 577, 580-81 (7th Cir. 2000).  Moreover, as noted by defendants, there is nothing to enjoin:  Bayer stopped using these commercials in 2008 (*See* Doc. 56 pp. 6-7, Doc. 56 p. 12 n.7; Doc. 54-2, Exhibit D, p. 73 (Aug. 10, 2008 entry for "Not Gonna Take It"); Doc. 54-2, Exhibit D, p. 99 (Oct. 5, 2008 entry for "Balloons")).

and fostered an environment that allowed Bayer to create and sustain a falsely inflated price for YAZ (Doc. 54-1 pp. 3-10).

## F. Putative

## Class Definition

The original putative class, set forth in plaintiff's Second Amended Complaint and argued for in plaintiff's motion for class certification, included the following putative class members:

> All consumers residing in the State of California who were exposed to **Defendant's television marketing and advertising of YAZ**, and who **requested, received, and purchased** their prescription for YAZ for the first time, during the period of time between August 20, 2007 and January 26, 2009, and who purchased YAZ for their own use and not for resale at a location within the State of California.

(Doc. 52 ¶ 58; Doc. 54; Doc. 54-1) (emphasis added). Bayer contends that the original proposed class is overly broad and not sufficiently definite or identifiable. In addition, Bayer argues that the plaintiff is not an adequate class representative, individual issues predominate, and the proposed class would be unmanageable (Doc. 56).

In her reply in support of class certification, plaintiff modified her original class definition and argues for certification of a revised class (Doc. 58). The following is the putative class definition the plaintiff is presently pursuing:[10]

> All consumers residing in the State of California who were exposed to **Defendant's Ads** and **purchased** their prescription for YAZ for the first time, during the period of time between August 20, 2007 and

---

[10] Because plaintiff adopted a new classification in her reply brief, the Court allowed defendants to file a supplemental brief in opposition (Doc. 61).

January 26, 2009, and who purchased YAZ for their own use and not
for resale at a location within the State of California.

(Doc. 58 p. 2) (emphasis added).[11]

The phrase "Defendant's Ads" is defined as including only the "Balloons"
and "Not Gonna Take It" television advertisements (Doc. 70 p. 2).  In this respect,
the revised class is somewhat narrowed in that it only includes those women who
were exposed to one or both of these television advertisements.  However, the
revised class is also expanded in that it is no longer restricted to women who
"requested" a YAZ prescription and no longer excludes women who saw written
literature before purchasing YAZ.

Plaintiff contends that the revised putative class definition addresses any
issues identified by Bayer in response to her original class definition.  She also
contends that a recent slip opinion from the Southern District of California,
*Krueger v. Wyeth, Inc.*, No. 11-80814 (D.C. No. 3:03-cv-2496-JAH (S.D. Cal.

---

[11]  The following are specifically excluded from the putative class:

> (i) the Defendant, their officers, directors and employees, and any entity in
> which the Defendant have a controlling interest, the agents, affiliates, legal
> representatives, heirs, attorneys at law, attorneys in fact or assignees
> thereof; (ii) any federal, state or local entity; (iii) any woman who has been
> diagnosed with, and ingested YAZ for the treatment of, PMDD; (iv) any
> woman who has been diagnosed with, and ingested YAZ for the treatment of
> moderate acne; (v) any woman who received any YAZ sample(s) prior to
> purchasing YAZ; (vi) any individual whose purchase of YAZ was made
> pursuant to a health insurance plan or policy which provided the individual
> with "flat co-payment" prescription drug benefits; and (vii) any California
> resident who maintains a claim against Defendant for personal injuries
> resulting from the ingesting of YAZ.

(Doc. 58 p. 8).

March 29, 2011) (Houston, J.) (Doc. 58-2) ("*Krueger*"), which certified a class of California consumers, involves analogous legal and factual issues and "compels" this Court to grant class certification (Doc. 58 p. 2).

Bayer contends that the revised class definition still does not meet the burden of proof for class certification (Doc. 62) and that *Krueger* is distinguishable.  The parties also dispute the requisite elements of plaintiff's claims, how to interpret the requisite elements of plaintiff's claims, and which (if any) of plaintiff's claims are subject to common proof.

## G.  Proposed Class Representative

The plaintiff and proposed class representative, Frances Burns, is a citizen of California.  Ms. Burns is a "good friend" of and works with Aimee Lambert, the wife of Richard Lambert, one of the class attorneys (Doc. 56-2 pp. 4, 16, 21-26). Ms. Burns became involved in this litigation after having a conversation with Ms. Lambert (Doc. 56-2 pp. 21-24).  During that conversation, Ms. Lambert told Ms. Burns about this litigation and informed her that her husband was having difficulty locating a suitable class representative (Doc. 56-2 pp. 21-24).  At that time, Ms. Burns informed Ms. Lambert that she had taken YAZ during the period in question and that she recalled seeing the complained of commercials (Doc. 56-2 pp. 21-26).  Ms. Burns then spoke with Mr. Lambert and his wife over the phone and arranged for a meeting (Doc. 56-2 pp. 24-26).  Subsequently, Ms. Burns became the class representative.  Ms. Burns testified that, independent of

this lawsuit, she has become better friends with Ms. Lambert over the last six months (Doc. 56-2 p. 16).

Ms. Burns states that she has experienced and continues to experience at least one of the following premenstrual symptoms during her menstrual cycles: (1) irritability; (2) moodiness; (3) anxiousness; (4) fatigue; (6) headaches; and (7) increased appetite (Doc. 54-3 p. 1). Ms. Burns has never been diagnosed with PMDD (Doc. 54-3 p. 2).

Ms. Burns began taking oral contraceptives in 2000 and intermittently used them through 2007 (Doc. 56-2 pp. 34-45).[12] The oral contraceptives Ms. Burns took during this time period include: Ortho Tri-Cyclen, Ortho-Cyclen, Lo/Ovral and Low-Ogestrel (the generic form of Lo/Ovral) (Doc. 56-2 pp. 34-45). Ms. Burns testified that these oral contraceptives exacerbated her PMS symptoms (Doc. 56-2 pp. 34-35, 43). As to Ortho Tri-Cyclen, Ms. Burns testified that it made her periods more painful, increased her menstrual flow, and generally exacerbated her PMS symptoms (Doc. 56-2 pp. 34-35). Ms. Burns' medical records indicate that her healthcare provider took her off of Ortho Tri-Cyclen and prescribed Ortho-Cyclen because she was having difficulty with spotting and Ortho-Cyclen might "be less likely to cause intermenstrual spotting" (Doc. 56-2 pp. 36-37).

In January of 2008, Ms. Burns saw her healthcare provider and "talked about various contraceptive options" (Doc. 56-2 p. 5). Ms. Burns advised her

_____

[12] Ms. Burns stopped taking oral contraceptives altogether in 2005 (Doc. 56-2 pp. 44-45). She restarted Lo/Ovral in January 2007 (Doc. 56-2 pp. 44-45).

healthcare provider that she did not like taking birth control pills and inquired about an intrauterine device (Doc. 56-2 p. 5).[13] The nurse practitioner advised against an intrauterine device and provided Ms. Burns with information regarding the same (Doc. 56-2 p. 6).[14] Ms. Burns testified that she considered her options and, recalling "the commercials," decided that YAZ was the best option (Doc. 56-2 pp. 5-6). On a subsequent visit to her healthcare provider (also in January 2008), Ms. Burns asserts that she specifically requested a prescription for YAZ (Doc. 56-2 pp. 58-59; Doc. 54-3 pp. 1-2). Ms. Burns' medical records do not state that Ms. Burns requested YAZ (Doc. 56-2 pp. 58-59).

In a sworn declaration in support of her motion for class certification, Ms. Burns states she selected YAZ, instead of a cheaper, equally effective oral contraceptive, "based on [her] reliance on Defendant's 'Not Gonna Take It' and 'Balloons' television advertisements, as after viewing said advertisements, [she] believed that YAZ was approved for, and/or proven effective in, curing, treating, and/or mitigating premenstrual symptoms and, would therefore, be effective in curing, treating and/or mitigating [her] premenstrual symptoms." (Doc. 54-3 p. 2 ¶ 5). In her plaintiff fact sheet disclosure, plaintiff states that she saw "Balloons" and "not Gonna Take It" prior to being prescribed YAZ (Doc. 56-17 p. 21). Further, in her plaintiff fact sheet, Ms. Burns states that she specifically recalled

---

[13] Ms. Burns testified that she "did not historically like taking birth control pills and did not like the effect it had on [her]" (Doc. 56-2 p. 6).
[14] Ms. Burns testified that the nurse practitioner advised against an intrauterine device because it was a longer commitment and she had not had children yet (Doc. 56-2 p. 6)

seeing the "Balloons" advertisement in the weeks preceding her appointment where she requested YAZ (Doc. 56-17 p. 21).

The "Balloons" commercial, however, did not air until May of 2008 (Doc. 54-2 Ex. D; Doc. 58 pp. 15-16). Ms. Burns requested her prescription for YAZ in January of 2008 (Doc. 54-3 pp. 1-2). Thus, Ms. Burns could not possibly have seen the "Balloons" advertisement prior to requesting a prescription for YAZ. In addition, Ms. Burns' deposition testimony indicates that she only viewed the "Not Gonna Take It" advertisement prior to requesting a prescription for YAZ (Doc. 56 pp. 15-16). Ms. Burns appears to concede as much in her reply in support of her motion for class certification (Doc. 58 p. 16).

After receiving a prescription for YAZ, Ms. Burns paid money to obtain the drug (Doc. 54-3 p. 2 ¶ 7). Ms. Burns states that during the period of time in which she was taking YAZ as her form of oral contraceptive (January 2008-August 2008), she did not realize any recognizable decrease, reduction, or other diminution in the number or severity of premenstrual symptoms she experienced (Doc. 54-3 p. 2 ¶ 8).

## H.  Motion to Strike

Plaintiff objects to certain evidence offered by defendant in opposition to plaintiff's motion for class certification and moves to strike the same (Doc. 58-4). First, plaintiff objects to defendant's reliance on Plaintiff Fact Sheets executed by California women who maintain a claim against the defendant for personal injuries resulting from their ingesting of YAZ. The Court does not consider this

evidence in resolving plaintiff's motion for class certification. Accordingly, this portion of the motion is denied as moot.

Plaintiff also objects to defendant's reliance on four documents downloaded from the American College of Obstetricians and Gynecologists (ACOG) website (Exhibits Q, S, T, and U to Doc. 56). Defendant presents these articles to support its position that YAZ can be used to treat PMS and premenstrual symptoms and that there is not an appropriate class-wide comparator drug. Plaintiff contends that these articles cannot be tendered in lieu of expert testimony but cites to no controlling authority for this proposition. Plaintiff also contends that the articles are irrelevant, lack appropriate authentication, contain hearsay, and/or deny plaintiffs the opportunity to cross examine the authors of the articles or studies. Because the Federal Rules of Evidence apply at the class certification stage, plaintiff contends that these articles must be stricken. It is not clear why the other scientific material attached as exhibits to the parties' briefing would not be subject to the same objections. Nonetheless, the Court need not resolve whether Exhibits Q, S, T, and U to Doc. 56 must be stricken. These articles were not necessary to the Court's resolution of plaintiff's class certification motion.[15] Accordingly, this portion of the motion is also denied as moot.

---

[15] The Court's Order considers Exhibit B to Doc. 56 (Doc. 56-3), an article from a scientific journal, but does not consider the disputed exhibits. The Court also considers certain scientific material attached to plaintiff's motion for class certification (Doc. 54). In assessing issues pertaining to a viable comparator drug, the Court considered the plaintiff's testimony (stating that certain oral contraceptives did not work well for her and actually worsened her premenstrual

# III.  CONTROLLING LAW

## A.  Importance of Addressing Controlling Authority

Questions concerning controlling law are often misinterpreted and/or overlooked by counsel.  Admittedly, such questions are particularly difficult in multidistrict litigation, which may involve parties from multiple states, the removal of cases from state to federal court, the transfer of cases between district courts, and issues of state and federal law.  In the instant case, at times, the parties reference appropriate controlling authority.  However, the parties spend an equal amount of time citing to opinions that have zero precedential value and/or decisions that are not controlling with regard to a district court sitting in Illinois.  Such citation is generally made without any explanation as to why the Court should consider the non-controlling decisions (*e.g.,* one might cite to decisions from appellate courts other than the Seventh Circuit because the Seventh Circuit has not addressed the matter in issue).  Perhaps most vexing is how often both parties make arguments that are primarily, if not exclusively, supported by citation to district court opinions from across the country.  The Court reminds the parties that such decisions have zero precedential value.  Further, this Court has specific case management procedures relating to citation of federal trial courts:

---

symptoms) (Doc. 56-2); scientific material (articles, studies, and the like) attached to the plaintiff's motion for class certification that are not objected to; and plaintiff's failure to attempt to identify a viable class-wide comparator drug (merely stating that any generic oral contraceptive would suffice because all birth control pills are 99% effective).

When parties or attorneys feel compelled to cite other federal trial courts as authority for a particular proposition of law, despite the complete lack of precedential authority thereof, the name of the trial judge whose order is cited should be included with the citation. Furthermore, the exact purpose in citing the case should be included since it is presumed that it is not cited as binding precedent on this Court. If a subsequent Seventh Circuit opinion, for example, relies upon the case for a reason pertinent to the action at bar, this Court should be so advised.

The parties also spend a great deal of time citing to decisions that are not controlling as to a particular issue. For instance, a decision from the California Supreme Court does not govern whether a plaintiff has constitutional standing. That is a federal matter governed by Federal law. Moreover, with regard to federal issues that are intended to be geographically uniform, this Court is governed by the Seventh Circuit Court of Appeals – even with regard to cases transferred from a California District Court (though the Court certainly considers and respects decisions from other Appellate Courts when the Seventh Circuit has yet to address a particular issue).

The Court reminds counsel that it is important to identify appropriate controlling authority and to follow this Court's local rules. An argument that relies on the wrong authority is a wasted opportunity. The Court does not criticize parties for citing to persuasive authority when controlling authority is unavailable. However, citation to such persuasive authority should be followed by an appropriate explanation. Further, basing ones argument entirely on decisions with little or no precedential value is a risky litigation strategy – particularly when, *sua sponte*, the Court is able to locate on-point controlling case law.

## B.  State Law Questions

With regard to questions of state law, when, as here, a case arises under a court's diversity jurisdiction and is transferred from the originating federal district court to the transferee federal district court, the transferee court applies the substantive law the originating court would have applied.  *See Chang v. Baxter Healthcare Corp*., 599 F.3d 728, 732 (7th Cir. 2010) (When a diversity case is transferred from one federal district to another, the substantive law applied is that of the jurisdiction from which the case was transferred); *International Marketing, Ltd. v. Archer-Daniels-Midland Company, Inc*., 192 F.3d 724, 729 (7th Cir. 1999) (the transfer of a diversity case from one federal district court to another leaves the law "unaffected").

Thus, to determine the requisite elements of each cause of action asserted by the plaintiff, the Court applies California substantive law as declared by the state's legislature or highest court.  *See Home Valu, Inc. v. Pep Boys-Manny, Moe and Jack of Del., Inc.,* 213 F.3d 960, 963 (7th Cir. 2000).  If California law is unclear, this court must predict how the Supreme Court of California would decide the question.  *Rodman Indus., Inc. v. G & S Mill, Inc.,* 145 F.3d 940, 942 (7th Cir. 1998).  In reaching this conclusion, the Court is obliged to consider the holdings of state appellate courts, but it is not bound to follow them if it has good reasons to diverge from them. *Baer v. First Options of Chicago, Inc.,* 72 F.3d 1294, 1301 (7th Cir.1995).

## C.  Federal Questions

Although, as to questions of state law, the law of the transferor court continues to apply when a diversity case is transferred[16] from one district court to another, the transferee court is "usually free to decide federal issues in the manner it views as correct without deferring to the interpretation of the transferor circuit," *McMasters v. U.S.*  260 F.3d 814, 820 (7th Cir. 2001).  The general rule is the law of the circuit where the transferee court sits governs questions of federal law.  *Id.*  The law of the transferor forum is only applied when the federal law in question is intended to be geographically non-uniform.  *Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1126 (7th Cir. 1993), *cert. denied,* 510 U.S. 1073, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994).

Here, plaintiff seeks class certification under Federal Rule of Civil Procedure 23.  Because Rule 23 is intended to apply uniformly throughout the territorial United States, it does not trigger the exception regarding application of the law of the transferor forum.  Accordingly, in assessing whether plaintiff's state

---

[16]  Although the Seventh Circuit has yet to decide which law governs federal claims in cases transferred under 28 U.S.C. § 1407, it has adopted the above rationale when resolving the question under 28 U.S.C. § 1404(a), which authorizes district courts to transfer cases for reasons of convenience.  See McMasters v. U.S., 260 F.3d 814, 819(7th Cir.2001); *Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1126 (7th Cir.1993), *cert. denied,* 510 U.S. 1073, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994).  As noted, when the relevant federal law is geographically uniform, transferee courts apply the law of the circuit in which they sit – without reference to the law of the transferor circuit.  This is because, in contrast to the multifarious and localized nature of state laws, "[a] single federal law implies a national interpretation .... [E]ach court of appeals considers the [federal] question independently ... without regard to the geographic location of the events giving rise to the litigation." *Eckstein,* 8 F.3d at 1126.

law claims are subject to certification under Rule 23, the Court applies Seventh Circuit law.[17]

## D. District Court Opinions

As a matter of law, district court opinions may properly be regarded as persuasive precedent but they are not binding on this Court.  See, e.g., *Howard v. Wal–Mart Stores, Inc.*, 160 F.3d 358, 359 (7th Cir. 1998) ("a district court's decision does not have precedential authority"); *Malabarba v. Chicago Tribune Co.*, 149 F.3d 690, 697 (7th Cir.1998) ("district court opinions are of little or no authoritative value"); *Old Republic Ins. Co. v. Chuhak & Tecson*, P.C., 84 F.3d 998, 1003 (7th Cir.1996) ("decisions by district judges do not have the force of precedent"); *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir. 1995) ("District court decisions have no weight as precedents, no authority.") *United States v. Articles of Drug Consisting of 203 Paper Bags*, 818 F.2d 569, 572 (7th Cir.1987) ("A single district court decision ... is not binding on the circuit, or even on other district judges in the same district").

As such, district court opinions have value only to the extent that the Court finds them persuasive on material issues in this case.

---

[17]  With regard to conflicts that arise between state certification standards and Rule 23 *See Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.,–– U.S. ––––, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010) (federal law regarding class actions is applied in Federal court; even in diversity actions arising under state law).

**E.** ***Krueger v. Wyeth, Inc.***, **No. 11-80814 (D.C. No. 3:03-cv-2496-JAH (S.D. Cal. March 29, 2011) (Houston, J.) (Doc. 58-2) ("Krueger")**

*Krueger* is a recent decision from the Southern District of California. In *Krueger*, the plaintiff alleged that the defendant engaged in a false advertising campaign which represented that its hormone replacement therapy drugs ("HRT") reduced the risk of cardiovascular disease, dementia, and Alzheimer's (*Krueger*, Doc. 58-2 p. 3). The defendant also allegedly represented that its HRT drugs did not cause breast cancer. *Id*. Subsequent studies revealed that the defendant's HRT drugs actually increased the risk for strokes, heart attacks, cardiovascular disease, breast cancer, Alzheimer's, and dementia. *Id*. The district court certified the following class:

> All California consumers who purchased Wyeth's Hormone Replacement Therapy products . . . between 1995 and 2003, and were exposed to a representation from Wyeth, or health care providers, or read in literature in which Wyeth advertised or provided to third parties to be disseminated under its brand or the third parties' brand, that [these products] lowered cardiovascular, Alzheimers and/or dementia risk, or did not increase breast cancer risk.

Plaintiff contends that *Krueger* "compels" this Court to grant class certification (Doc. 58 p. 2). The Court agrees that there are similarities between *Krueger* and the instant case. However, *Krueger* does not "compel" this Court to grant certification. As noted above, district court decisions are not binding or controlling on this Court. Thus, *Krueger*, has no precedential value.

Plaintiff also claims it would be an "injustice" to have a California district court grant certification in a substantially similar case, while having this Court deny certification (Doc. 58 p. 2).[18] This argument is not tenable. The *Krueger* decision was decided by the Honorable Judge Houston in the Southern District of California. There is no guarantee that Judge Houston or any other judge sitting in the Southern District of California would grant certification in *this* case. Moreover, plaintiff's case was transferred from the *Eastern* District of California. Accordingly, the argument that a denial of class certification would somehow deprive putative class members of the result that plaintiff *thinks* she would have received in the *Southern* District of California is not persuasive.

Finally, the Court has reviewed the *Krueger* decision and the arguments related thereto. The Court finds that the decision is distinguishable. The, drugs at issue in *Krueger* purportedly had the *opposite* effect of their advertised benefits; they actually increased the risk of developing serious life-threatening medical conditions. Representations or omissions of this nature would clearly be material to putative class members. Here, the subject of the allegedly fraudulent conduct – the product's efficacy or approval in treating certain symptoms - is significantly different than the subject of the allegedly fraudulent conduct at issue in *Krueger* – the product's serious health risks. Unlike the misrepresentations or omissions at issue in *Krueger*, the misrepresentations or omissions at issue here

---

[18] Plaintiff states "principles of justice require that the California consumers whom Plaintiff seeks to represent not be denied a result in this Court that they would otherwise receive had the case remained in California" (Doc. 58 p.2).

may not have been material to a number of class members. Instead, the issue of materiality varies from person to person, making a class-wide presumption as to materiality inappropriate.

In addition, the plaintiff's claims in *Krueger* were "based on uniform[19] material misrepresentations that were part of a pervasive, strategically orchestrated, widespread, multi-year [8 years] advertising campaign." (*Krueger*, Doc. 58-2 p. 18). This type of extensive advertising campaign (particularly one involving such egregious misrepresentations and omissions) stands in stark contrast to the advertising campaign at issue in the instant case.[20] *See Pfizer Inc. v. Superior Court*, 105 Cal. Rptr. 3d 795, 803-804 (Cal. Ct. App. 2010) (stating that a decades-long advertising campaign involving health risks associated with smoking, stands in "stark contrast" to a six-month long allegedly misleading advertising campaign regarding the benefits of mouthwash); *Sevidal v. Target Corp.*, 117 Cal. Rptr. 3d 66, 83-84 (Cal. Ct. App. 2010) (noting significant difference between an advertising campaign that failed to disclose a product

---

[19] The HRT drugs at issue in *Krueger* were available by prescription only. In considering the question of uniformity the court in *Krueger* did not consider whether putative class members' prescribing physicians were exposed to the same alleged misrepresentations or omissions. This Court would have considered representations and/or omissions made to the prescribing physician *and* to putative class members when assessing uniformity and materiality. *See* section V.D.2.b.iii., *infra*.

[20] The advertising campaign at issue in the instant case lasted for 18 months and involved two advertisements that allegedly contained the same misrepresentations and omissions. During the class period, a corrective advertisement aired that may have been viewed by putative class members and literature containing accurate information was available.

contained an illegal substance and an advertising campaign that made false allegations about whether product was "Made in U.S.A.").[21]

Finally, in *Krueger*, valuation was not at issue. As the *Krueger* court explained, the plaintiff did not "contend that absent Wyeth's deceptions she would have purchased another, less risky product. Because there was no similar hormone therapy drug on the market during the class period, the choice offered to plaintiff and putative class members was to purchase Wyeth's HRT drugs or buy nothing." (*Krueger*, Doc. 58-2 p. 8). Accordingly, in *Krueger* there was "no need for an individualized assessment of the drug's value to each class member nor an individualized assessment of the proper comparator drug for each class member." *Id.* Here, plaintiff has put valuation at issue by alleging that, absent defendant's allegedly misleading advertising campaign, she would have purchased another equally effective and less expensive oral contraceptive.[22]

_____

[21] Plaintiff makes the following statement in one of her reply briefs: "[Plaintiff is not] aware of any case where the duration of a false advertising campaign had any bearing on materiality, and Defendant has certainly not cited any." (Doc. 73 p. 5). The cases referenced above indicate California courts consider a number of factors when assessing materiality, including the length of the advertising campaign, the subject matter of the alleged misrepresentations or omissions, the size of the advertising campaign, and the uniformity of the advertising campaign. In fact, the court in *Krueger* discussed these factors (*See Krueger*, Doc. 58-2 pp. 17-18 (noting length of advertising campaign, subject matter of advertising campaign, and uniformity)). *See also In re Tobacco II Cases*, 207 P.3d 20 (Cal. 2009) (noting that, for purposes of standing and when the plaintiff alleges exposure to a long-term ("decades-long") advertising campaign involving significant risks to one's health, an allegation of reliance is not defeated merely because alternative information was available).

[22] Plaintiff contends that she is seeking a refund of the entire purchase price and valuation is not at issue. However, the fact that plaintiff is seeking a full refund does not establish that she is entitled to a full refund. Plaintiff alleges that, absent

# IV. STANDING

## A. Statutory and Constitutional Standing

There are two types of standing that must be considered by the Court: (1) constitutional or Article III standing and (2) statutory standing.[23] In order to have constitutional or Article III standing a plaintiff must allege: (1) injury in fact, meaning an invasion of a legally protected interest that is concrete and particularized, actual or imminent, and not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of, such that the injury is fairly traceable to the defendant's actions; and (3) that a favorable decision is likely to redress the injury. *Tobin for Governor v. Ill. State Bd. Of Elections*, 268 F.3d 517, 527 (7th Cir. 2001). Constitutional standing is a federal question governed by federal law.

Statutory standing relates to legislatively-created causes of action. Generally, the statutory standing requirement asks whether a statute creating a private right of action authorizes a particular plaintiff to avail herself of that right

---

defendant's alleged deceptions, she would have purchased another equally effective and less expensive product. In essence, plaintiff contends that she paid more for YAZ than it was worth. Considering this, the appropriate measure of restitution is the difference between the price paid and the value of what plaintiff received, not a refund of the full purchase price. *See* section V.d.2.d., *infra*.

[23] There is also a third type of standing, prudential standing. Prudential standing allows a court to exercise some discretion in determining whether a claim is appropriate for judicial resolution. *See Valley Forge Christian Coll. V. Am. United for Separation of Church & State*, 454 U.S. 464, 474-75, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982). In the instant case, the parties do not raise any arguments with regard to prudential standing and the Court is satisfied that prudential standing exists. Accordingly, the Court's analysis does not address prudential standing.

of action (*i.e.* is the plaintiff within the class intended to be protected by the relevant statute). *Kohen v. Pacific Ins. Management Co., LLC*, 571 F.3d 672 (7th Cir. 2009). Whether plaintiff has standing to sue under the UCL,[24] FAL, CLRA,[25] or under California's fraudulent concealment statute are statutory standing questions.

## B. Putative Class Members are not Assessed for Standing

Defendant contends the putative class includes members who did not sustain an actual injury, and thus lack Article III standing. As support for its position, defendant cites to a decision from the Eighth Circuit Court of Appeals and two district court opinions (one from the Central District of California and one from the District Court of Maine) (Doc. 56 p. 20). All three of these decisions purportedly denied class certification because the putative class members lacked Article III standing (Doc. 56 p. 20). Defendant offers no explanation as to why this Court should rely on these decisions and not on Seventh Circuit authority.

---

[24] The UCL and FAL have identical standing requirements; both require injury in fact and lost money or property as a result of the allegedly fraudulent conduct. *See* Cal. Civ. Code §§ 17204, 17535; *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 883-884 (Cal. 2011). The California Supreme Court has held that (1) to establish standing under the UCL and FAL, a plaintiff must establish actual reliance on the allegedly fraudulent conduct and (2) in the class action context, only the class representative – not absent class members – is assessed for standing. *See Tobacco*, 207 P.3d 20 (Cal. 2009).

[25] To have standing under the CLRA, a plaintiff must prove he or she was damaged as a result of an alleged unlawful practice. *See Meyer v. Sprint Spectrum L.P.,* 200 P.3d 295, 299 (Cal. 2009).

Plaintiff counters, arguing that, pursuant to Seventh Circuit Authority, only the class representative is assessed for Article III standing (Doc. 58 p. 15).[26]

The relevant Seventh Circuit authority indicates that questions of standing – both constitutional and statutory – are only applicable to the named plaintiff. *See Kohen*, 571 F.3d at 677-678 (putative class members are not assessed for standing);[27] *Morlan v. Universal Guar. Life Ins. Co.*, 298 F.3d 609, 616 (7th Cir. 2002) (standing in a proposed class action depends solely on the standing of the named plaintiff, not the putative class). *See also Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002) (standing in a class action is demonstrated by proving that the prerequisites for class certification under Rule 23 of the Federal Rules of Civil Procedure are met).

Thus, in assessing standing, the Court considers whether the named plaintiff is properly before the Court, not whether the absent class members are properly before the Court. With respect to putative class members, the appropriate question is not whether they have standing to sue but whether the named plaintiff may assert their rights. Whether the named plaintiff may assert the rights of the putative class is determined by evaluating (1) whether the named

---

[26]    Plaintiff also cites to several non-controlling unpublished decisions from district courts in California. Plaintiff fails to explain why such decisions are relevant and fails to identify the judge that decided each district court opinion as required by this Court's rules.

[27]    The Seventh Circuit's decision in *Kohen v. Pacific Inv. Mgmt. Co. LLC & PIMCO Funds*, 571 F.3d 672 (7th Cir. 2009), discusses putative class members and questions of standing. *See Id.* at 676-677. Defendant cites to aspects of the *Kohen* decision in support of other arguments raised in its briefing. In presenting its Article III standing argument, however, defendant ignores *Kohen*; citing instead to three non-controlling decisions.

plaintiff has standing and (2) whether the named plaintiff satisfies the Rule 23 criteria. *See Kohen*, 571 F.3d at 676-677; *Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002).

Finally, the Court notes that in assessing whether a class is overly broad for purposes of class certification, it considers whether the putative class includes members who could not possibly have been injured by the defendant's conduct. *Kohen*, 571 F.3d at 677-678. Although this analysis (and other aspects of the Rule 23 evaluation) may implicate questions associated with standing, the Court does not engage in a separate standing analysis for each individual class member. *See Id*. at 676-677. *See also Morlan*, 298 F.3d at 616; *Payton,* 308 F.3d at 680.

## C. Plaintiff's Additional Standing Arguments

Plaintiff argues that the California Supreme Court's decision in *Kwikset Corp. v. Superior Court*, 246 P.3d 877 (Cal. 2011) establishes that under the UCL and FAL, plaintiff and the putative class have standing to seek restitution (Doc. 58 p. 16).[28] Plaintiff also contends that the *California Supreme Court's* holding in *Kwikset* as to *standing under the UCL and FAL* "is dispositive as to the fact that each Class member has *Article III standing*, but need not individually prove it" (Doc. 58 p. 16). Plaintiff's arguments confuse a number of legal issues and

---

[28] In *Kwikset Corp. v. Superior Court*, 246 P.3d 877 (Cal. 2011), the California Supreme Court held that "[f]or each consumer who relies on the truth and accuracy of a label [in this case advertisement] and is deceived by misrepresentations into making a purchase, the economic harm is the same: the consumer has purchased a product that he or she paid more for than he or she otherwise might have been willing to pay if the product had been labeled accurately." *Kwikset*, 246 p.3d at 890.

misinterpret two important decisions from the California Supreme Court: (1) *Kwikset Corp. v. Superior Court*, 246 P.3d 877 (Cal. 2011) and (2) *In re Tobacco II Cases*, 207 P.3d 20 (Cal. 2009) ("*Tobacco II*"). A number of other aspects of the briefing reflect the same misunderstandings. Thus, the Court briefly clarifies the relevant matters below.

### 1. Constitutional Standing, Statutory Standing, and Controlling Law

As noted above, Article III standing is a federal question governed by federal law. Thus, to the extent the California Supreme Court addressed Article III standing in *Kwikset*, it would not be controlling here.[29] Further, a California Supreme Court decision resolving questions of *statutory* standing under the UCL and FAL is not "dispositive" of anything with regard to questions of Article III standing; statutory standing and constitutional standing are two separate concepts.

### 2. *In re Tobacco II Cases*, 207 P.3d 20 (Cal. 2009) and UCL/FAL Standing

In 2004, Proposition 64 amended the standing requirements under the UCL and FAL so that a private plaintiff has standing to bring a UCL or FAL action if the plaintiff "has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. §§ 17204, 17535.[30] In

---

[29] The court considered Article III standing requirements only for purposes of comparison to the UCL and FAL standing requirements. *Kwikset*, 246 P.3d at 885.

[30] Traditionally, the UCL and FAL did not limit the filing of UCL and FAL lawsuits to persons who had actually been harmed by the complained of business practice. *Californians for Disability Rights v. Mervyn's, LLC*, 138 P.3d 207, 209 (Cal.

*Tobacco II*, the California Supreme Court addressed Proposition 64's standing requirements and reached the following conclusions:  (1) Proposition 64's amended standing provisions "require a showing of actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions" and (2) for purposes of standing and where class requirements have otherwise been found to exist, the requirements imposed by Proposition 64 (actual injury, lost money and property, and reliance) apply only to the class representative and not absent class members.  *Tobacco II*, 207 P.3d at 28. *See also Id*. at 35-41.[31]

The California Supreme Court went on to discuss the elements necessary to state a claim under the UCL and FAL and entitlement to restitution under the UCL and FAL.  With respect to these issues, the court noted and discussed the following: (1) to state a claim under either statute all that is necessary is fraudulent conduct that was "likely to deceive"; (2) entitlement to restitution under either statute requires lost money or property which "may have been acquired" by means of the fraudulent conduct; and (3) restitution is available under either statute without individualized proof of deceit, reliance, or injury.

---

2006); *Sevidal v. Target Corp.*, 117 Cal. Rptr. 3d 66, 81 (Cal. Ct. App. 2010). *See also Tobacco II*, 207 P.3d at 31-32.  The statutes merely required a showing that members of the public were "likely to be deceived" and allegations of actual deception, reliance, and damage were not necessary.  *Tobacco II*, 207 P.3d at 31-32.
[31] *See also Cohen v. DIRECTV, Inc.*, 101 Cal. Rptr. 3d 37, 48-49 (Cal. Ct. App. 2009) (stating that *Tobacco II*, essentially held "*for purposes of standing* in context of the class certification issue in a 'false advertising' case involving the UCL, the class members need not be assessed for the element of reliance").

These concepts are separate from and should not be confused with the statutes' standing requirements.

### 3. *Kwikset Corp. v. Superior Court*, 246 P.3d 877 (Cal. 2011) and UCL/FAL Standing

In *Kwikset*, the California Supreme Court again interpreted the statutory standing requirements for UCL and FAL actions. The court concluded that plaintiffs may meet the applicable statutory standing requirements ("injury in fact" and lost money or property "as a result of" the unlawful conduct) "by alleging that they would not have bought the product but for the misrepresentation [because] such an allegation establishes both causation and a sufficient economic injury – the extra money paid." *Id.* at 890-891.

The class representatives in *Kwikset* alleged they were deceived into buying the defendant's locksets by the false label "made in U.S.A." The California Appellate Court affirmed the sustaining of defendant's demurrer on the ground that the plaintiffs received what they paid for – locksets – and the fact that the locksets were not entirely American-made did not qualify as a loss of money or property under the UCL or FAL. Applying the standard stated above, the California Supreme Court rejected this theory and concluded that the class representatives had sufficiently alleged standing under the UCL and FAL.[32]

---

[32] In so holding the Court stated as follows:

> For each consumer who relies on the truth and accuracy of a label and is deceived by misrepresentations into making a purchase, the economic harm is the same: the consumer has purchased a product that he or she *paid more for* than he or she otherwise might have been willing to pay if

The court went on to state that the statutes' requirements for establishing standing ("injury in fact" and "lost money or property as a result of the improper conduct") are "wholly distinct" from the statutes' requirements for establishing entitlement to restitution (lost money or property "which may have been acquired by means of" the improper conduct). Thus, the court explained, standing under the UCL and FAL is not dependent on whether the plaintiff is entitled to restitution. The court noted that this distinction is important for plaintiffs who have suffered a loss of money or property without any corresponding gain by the defendant (*e.g.*, defendant's conduct diminished the value of plaintiff's home). This type of injury would not be sufficient to establish entitlement to restitution because nothing was "acquired" by the defendant. However, it would be sufficient for establishing standing and entitlement to injunctive relief. If standing to sue were dependent on eligibility for restitution, the court explained, "injunctive relief—the primary form of relief under the UCL—[would be] rendered dependent on the availability of a mere ancillary form of relief." *Id*. at 895. A result that is clearly not compatible with the statutes' purpose or plain language. *Id*.

Accordingly, *Kwikset* establishes that (1) overpayment as a result of defendant's allegedly fraudulent conduct is a sufficient economic injury for

---

the product had been labeled accurately. This economic harm—the loss of real dollars from a consumer's pocket—is the same whether or not a court might objectively view the products as functionally equivalent.

*Kwikset*, at 890. As an example, the Court explained that "[n]onkosher meat might taste and in every respect be nutritionally identical to kosher meat, but to an observant Jew who keeps kosher, the former would be worthless." *Id*.

purposes of establishing *standing* under the UCL and FAL; and (2) ineligibility for restitution is not a basis for denying *standing* under the UCL or FAL. It does not establish that the requirements for stating a claim for restitutionary relief under the UCL and FAL are irrelevant or that they will always be subject to common proof.[33]

## D.  The Class Representative Has Standing

Plaintiff alleges that she requested a prescription for YAZ, as opposed to requesting an oral contraceptive that was equally effective in preventing pregnancy but less-expensive, based on her reliance on the defendant's alleged omissions. In essence, plaintiff contends she paid an overcharge – more than she otherwise would have – because of the allegedly fraudulent advertising campaign. The contention that plaintiff paid an inflated price for YAZ is sufficient to confer Article III standing. *See e.g.*, *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc*., supra, 528 U.S. at pp. 183–184, 120 S.Ct. 693 (economic harm is among the bases for injury in fact); *Loeb Industries, Inc. v. Sumitomo Corp*., 306 F.3d 469, 481 (7th Cir. 2002) (paying an inflated price is sufficient injury for Article III standing).

---

[33]  As is explained in more detail below, recovery under the UCL and FAL is typically available without individual proof of deceit, reliance, or injury. Nonetheless, a plaintiff who could not possibly have been injured by the allegedly fraudulent conduct is not entitled to restitution under either statute. When assessing whether Rule 23(b)(3)'s predominance requirement is met a court considers the substantive elements of a plaintiff's claims and the proof necessary to establish those claims. In the instant case, plaintiff is seeking restitutionary relief. Thus, in assessing whether common issues predominate the Court properly considers what will be necessary to establish entitlement to restitution and whether those elements are susceptible to class treatment.

The alleged overcharge in conjunction with plaintiff's allegations pertaining to causation and reliance are sufficient to confer statutory standing under the relevant California statutes.  *See Kwikset Corp. v. Superior Court*, 246 P.3d 877 (Cal. 2011) (plaintiffs who were deceived by a product's label into spending money to buy the product, and would not have bought it otherwise, have lost money or property within the meaning of the UCL, and thus have standing to sue);[34] *Clayworth v. Pfizer Inc.,* 233 P.3d 1066, 1086-87 (Cal. 2010) (lost money in the form of overcharges sufficient to confer standing under the UCL); *Meyer v. Sprint Spectrum L.P.*, 45 Cal. 4th 634, (Cal. 2009) (for CLRA claims, class representative must show tangible increased cost or burden resulting from alleged unlawful practice).

## V.  CLASS CERTIFICATION ANALYSIS

## A.  Requirements for Class Certification

A plaintiff seeking class certification has the burden of proving that the proposed class meets the requirements of Rule 23.  *Wal–Mart Stores v. Dukes*, –– – U.S. ––––, ––––, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011) (plaintiff seeking class certification "must affirmatively demonstrate" her compliance with Rule 23).

---

[34]  The injury alleged in *Kwiksett* is distinguishable from the injury alleged in the instant case.  In *Kwiksett*, the plaintiffs alleged that they would not have bought the product *at all* had they known the truth.  Thus, the money paid for the product was the "lost money" necessary for establishing standing under the UCL. The circumstances here are slightly different.  Plaintiff alleges that she was deceived by defendant's advertising into believing that YAZ was indicated for the treatment of PMS and premenstrual symptoms, and that, as a result of this deception, she purchased YAZ instead of a cheaper equally effective oral contraceptive.

*See also General Tele. Co. of S.W.*, 457 U.S. at 160-61; *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir.1993) (failure by the movant to satisfy any one of Rule 23's elements precludes certification).[35]  Rule 23(a) has four prerequisites:  (1) numerosity;[36] (2) commonality;[37] (3) typicality;[38] and (4) adequacy of representation.[39]

If the plaintiff satisfies these requirements, she must also meet one of the requirements of Rule 23(b).  Here, plaintiff seeks class certification under Rule

---

[35]  Plaintiff often contends that defendant has failed to prove or failed to offer evidence proving certain facts or legal issues.  This is not the proper standard.  In the class certification analysis the plaintiff carries the burden of establishing that class certification is proper.

[36]  Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." *Spano v. The Boeing Co.*, 633 F.3d 574, 583 (7th Cir.2011).

[37]  Rule 23(a)(2) "requires the presence of questions of law or fact common to the class." The rule does not mandate absolute commonality; a common nucleus of operative fact is usually enough to satisfy the requirement. *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir.1998).

[38]  Rule 23(a)(3) requires that Plaintiffs establish "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  A claim is typical if it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and ... her claims are based on the same legal theory." *Oshana v. Coca-Cola Co.,* 472 F.3d 506, 514 (7th Cir. 2006) (*quoting Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir.1992). "Even though some factual variations may not defeat typicality, the requirement is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Id.* (internal quotations omitted).

[39]  "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods.*, 521 U.S. at 625, 117 S.Ct. 2231.  To establish that they will fairly and adequately protect the interests of the class, class representatives must show that: (1) their claims are not antagonistic to or in conflict with those of the proposed class; (2) they have sufficient interest in the outcome of the case; and (3) experienced, competent counsel represents them. *See Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir.1992).

23(b)(3). In order to succeed under Rule 23(b)(3), plaintiff must show that "questions of law or fact common to members of the class predominate over any questions affecting individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

Finally, although Rule 23 is silent on the matter, it implicitly requires that the plaintiff establish the existence of a definable class. *Rosario v. Livaditis*, 963 F.3d 1013, 1017 (7th Cir. 1992)*; Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981); *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977–78 (7th Cir. 1977). A sufficiently definite class exists if the class is (1) ascertainable and (2) not overly broad. *See Kohen v. Pacific Inv. Management Co. LLC*, 571 F.3d 672, 676-679 (7th Cir. 2009); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513-515 (7th Cir. 2006); *Alliance to End Repression*, 565 F.2d at 977-978.

## B. Analysis – Rule 23 Prerequisite of an Ascertainable Class

Plaintiff contends that, because the putative class is restricted to consumers who viewed "Balloons" and "Not Gonna Take It," the class is sufficiently definite. Plaintiff proposes that the Court adopt the "simple" two-step process utilized by the Southern District of California in *Krueger* (Doc. 73 pp. 3-5).

In *Krueger*, the court concluded that class membership could be determined by requiring absent class members to provide pharmacy records showing proof of purchase and asking absent class members to answer two

"objective" questions: "(1) Did you hear a representation that [Wyeth's products] decreased cardiovascular disease, Alzheimers or dementia or did not increase breast cancer? (2) if so, from what source?" *Krueger v. Wyeth, Inc*., Order Denying Defendant's Motion for Reconsideration, (D.C. No. 3:03-cv-2496-JAH) (S.D. Cal. Doc. 122 p. 4) (S.D. Cal. Jul. 12, 2011) (Houston, J.). Plaintiff proposes that in the instant case, absent class members can initially be identified using pharmacy records (Doc. 73 pp. 3-4). Once class members have been identified on this basis, they can then be asked one question: "Did you see one of the Ads ["Balloons" or "Not Gonna Take It"] prior to making your purchase of YAZ?" *Id*. at p. 4.

The Court is not convinced that plaintiff's proposal is an appropriate or administratively feasible method of determining class membership in the instant case. During the class period, Bayer ran three television advertisements: (1) "Balloons," (2) "Not Gonna Take It," and (3) "Three Women PMDD." The "Three Women PMDD" advertisement expressly addressed one of the issues allegedly misrepresented in "Balloons" and "Not Gonna Take It" (distinguishing PMDD from PMS and other premenstrual symptoms not severe enough to warrant a diagnosis of PMDD). Plaintiff's proposal does not adequately address issues related to the "Three Women PMDD" advertisement, the role of the prescribing physician, and/or other literature pertaining to YAZ that was available during the class period.

In addition, there is no objective way to determine who saw the complained of television advertisements.[40]  Instead, class membership would depend on the subjective and often unreliable vagaries of human memory.  The record in the instant case exemplifies the problems that would arise in assessing actual exposure. The putative class representative, Frances Burns, initially claimed that prior to obtaining a prescription for YAZ in January 2008, she viewed the "Balloons" and "Not Gonna Take It" television advertisements (Doc.  54-3 pp. 1-2 ¶¶ 3-4).[41]  However, during her deposition, Ms. Burns testified that she couldn't "recall specifically" which television advertisements she viewed or exactly when she viewed them.  *Id*. at p. 20.[42]  Further, Ms. Burns' description of the advertisements she viewed prior to January 2008, indicates that she never saw the "Balloons" advertisement.  Ms. Burns described viewing the "Not Gonna Take

---

[40]  The claims asserted by plaintiff require (at a minimum) exposure to the allegedly fraudulent conduct.  This includes UCL and FAL class actions – even though the UCL and FAL do not require an individual showing of deception, reliance, or injury.  *See e.g., Davis-Miller v. Automobile Club of Southern California*, 134 Cal. Rptr. 3d 551, 562 (Cal. Ct. App. 2011); *Knapp v. AT & T Wireless Services, Inc.,* 124 Cal. Rptr. 3d 565, 575 (Cal. Ct. App. 2011).

[41]  Specifically, Ms. Burns states:  "During the Class period, I, on numerous occasions including, but not limited to, in or about January of 2008, saw [the "Not Gonna Take It" and "Balloons" television advertisements]."  (Doc. 54-3 p. 1 ¶ 3).  After viewing the "Ballons" and "Not Gonna Take It" television advertisements, Ms. Burns states that she attended an appointment with her healthcare provider and requested a prescription for YAZ.  *Id*. at p. 2 ¶ 4.

[42]  Ms. Burns stated that she remembered viewing a television commercial featuring the song "Not Gonna Take It" and a television advertisement with balloons (Doc. 56-2 p. 20).  Although Ms. Burns couldn't recall exactly when she viewed the "Balloons" and "Not Gonna Take It" commercials she was positive that she viewed one or both of the commercials by the summer of 2007.  *Id*.  Subsequently, Ms. Burns testified that she viewed the "Ads" and "commercials" (plural) prior to obtaining a prescription for YAZ in January 2008.  *Id*. at 22:25-23:3, 33:18-34:7

It" advertisement and "another [ad] involving a group of women at a nightclub." *Id*. at 98:25-100:11. The "Balloons" commercial did not take place in a nightclub. But, the "Three Women PMDD" advertisement did involve a group of women at a nightclub.[43] Moreover, the "Balloons" advertisement did not air until May 2008 – four months after Ms. Burns was prescribed YAZ. Thus, Ms. Burns could not have viewed the "Balloons" advertisement prior to receiving a prescription for YAZ in January 2008.

In light of the above, the Court is not convinced that a questionnaire containing the single question proposed by the plaintiff (or containing any group of questions) will afford adequate procedural protection to defendant. As described above, Ms. Burns originally claimed she was exposed to misrepresentations and omissions while viewing the "Balloons" commercial. However, her medical records and deposition testimony demonstrate that she did not view this commercial. Defendant is entitled to test the memory and credibility of each potential class member just as it did with Ms. Burns. Accordingly, determining class membership can only be accomplished through arduous individual inquiries pertaining to each unnamed class member.

---

[43] The "Three Women PMDD" advertisement aired in the months before Ms. Burns was prescribed YAZ. As previously noted, the "Three Women PMDD" commercial distinguished PMDD from PMS. Plaintiff does not assert that this advertisement contained misrepresentations or omissions.

## C.  Analysis - Rule 23(a) Requirements

### 1.    Numerosity

The court finds, and defendant does not contest, that the Rule 23(a)(1) numerosity requirement is satisfied.

### 2.  Commonality

The Court finds that the Rule 23(a)(2) requirement of commonality is met. The putative class members share common factual issues.  In addition, common questions of law are present, namely whether the alleged misconduct was deceptive or misleading.  These common questions are sufficient for purposes of Rule 23(b)(3)'s commonality requirement.  *See Spano v. The Boeing Co.*, 633 F.3d 574, 585 (7th Cir. 2011).[44]

### 3.  Typicality

Federal Rule of Civil Procedure 23(a) "requires, among other things, that the claims or defenses of the representative party be typical of the claims or defenses of the class." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009) (internal citation omitted).  "Although the typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs

---

[44]  In the Court's commonality inquiry, the fact that the named plaintiff could not have viewed the "Balloons" commercial is of no consequence; both commercials allegedly contained the same omission.  Rule 23(a)(2) "does not demand that every member of the class have an identical claim." *See Spano v. The Boeing Co.*, 633 F.3d  574, 585 (7th Cir. 2011).  Instead, Rule 23(a)(2) is satisfied where one or more common questions of law or fact exist.  *See Id.*  Further, the noted distinction regarding the "Balloons" commercial does not defeat a finding of adequacy or typicality.  *See De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)  ("subsection a(3) primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large").

and those of other class members, the requirement primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Id.* (internal citation omitted).

In the instant case, the Seventh Circuit's application of the typicality requirement in *Oshana v. Coca-Cola Co.,* 472 F.3d 506, 514 (7th Cir. 2006) ("*Oshana*") is instructive. In, *Oshana* the plaintiff alleged that the Coca-Cola Company deceived Fountain Diet Coke consumers by failing to disclose that fountain Diet Coke is not the same product as bottled Diet Coke (fountain Diet Coke is sweetened with saccharin and aspartame, bottled Diet Coke is sweetened only with aspartame). *Id.* at 509. The representative plaintiff claimed that she was deceived by Coca-Cola's alleged misrepresentations and/or omissions and suffered a resultant injury. The putative class included members who were not deceived (*i.e.* people who knew fountain Diet Coke contained saccharin and bought it anyway). The Seventh Circuit found that this difference undermined typicality. *Id.* at 514.[45]

---

[45] In addition, the Court found the representative's claims were subject to certain unique factual defenses and that these defenses undermined typicality. *Oshana*, 472 F.3d at 514. In particular, the Court noted the class representative had made the following admissions: she did not see any Coke advertisements during the relevant period; she knew fountain and bottled Diet Coke were different because bottled Diet Coke tasted better; and she continues to drink fountain Diet Coke even though she now knows it contains saccharin. In the instant case, there is some indication that the representative plaintiff is subject to a unique factual defense. Ms. Burns' testimony indicates that she saw the "Three Women PMDD" commercial prior to obtaining a prescription for YAZ. This advertisement expressly addressed the allegedly misleading statements or omissions in the

As is discussed later in this Order, plaintiff's CLRA and fraudulent concealment claims require a showing of reliance and the record does not warrant an inference of reliance as to the entire class. Thus, plaintiff's CLRA and fraudulent concealment claims are substantially similar to the ICFA claim at issue in *Oshana*. Here, plaintiff claims she was deceived by an allegedly fraudulent advertisement and suffered resultant harm. The putative class, however, necessarily includes women who took YAZ knowing it was not approved for the treatment of PMS or premenstrual symptoms.

Plaintiff's UCL and FAL claims do not require a showing of reliance. Rather, plaintiff must show that the fraudulent conduct was "likely to deceive" a reasonable consumer. This standard is subject to common proof if the actionable conduct was both uniform and material. Thus, materiality is a relevant factor in the Court's class certification analysis. In the instant case, plaintiff claims that she suffered from and sought treatment for premenstrual symptoms. The putative class, however, includes women who did not suffer from PMS or premenstrual symptoms, who did not require treatment for PMS or premenstrual symptoms, and/or who took oral contraceptives for the sole purpose of birth control. For these plaintiffs, the subject of the allegedly fraudulent advertisement campaign would not have been material. Plaintiff's claims are not typical of these putative class members.

---

complained of television commercials. Accordingly, the absence of reliance and/or causation may be an issue for Ms. Burns' claims. However, the Court's denial of class certification is not based on this observation.

**4. Adequacy**

Defendant argues the named plaintiff, Ms. Burns, is an inadequate representative due to her relationship with class counsel's wife. As discussed above, Ms. Burns works with and is a "good friend" of class counsel's wife (Doc. 56-2 p. 16; Doc. 56-2 p. 4). Further, independent of this lawsuit, Ms. Burns states that she has become better friends with class counsel's wife over the last six months (Doc. 56-2 p. 16).

As noted by the Seventh Circuit, "relatives [of class representatives], or business associates" of class representatives are likely too closely related to class representatives to act as class counsel and to adequately represent the interests of the class. *Susman v. Lincoln American Corp.*, 561 F.2d 86, 95 (7th Cir. 1977). This inadequacy stems from the likelihood that a conflict of interest will exist when there is a close relationship between the class representative and class counsel. *See Id.* at 91, 95-96 ("fear as to the danger of champerty" exists when there is a "close relationship between the putative class representative and counsel"). The determination of inadequacy based on close relationships is on a case-by-case basis. *Id.* at 90.

In the instant case, the disputed relationship does not rise to the level of a familial relationship and Ms. Burns and class counsel are not direct business associates. Nonetheless, the close relationship between Ms. Burns and counsel's wife raises serious concerns as to Ms. Burns's adequacy to represent the instant class. Given that the potential recovery for plaintiffs is minimal compared to the

potentially high amount of attorneys' fees that may be awarded, Ms. Burns may be more concerned with helping to maximize the monetary return of her "good friend" and co-worker (counsel's wife) than with her duty to zealously advocate on behalf of the class' interests. This is the type of situation that creates a conflict of interest. Considering this, the Court finds that Ms. Burns is not sufficiently independent of class counsel and does not satisfy the adequacy of representation prong.

## D. Analysis - Rule 23(b)(3) Requirements

### 1. Rule 23(b)(3) Requirements

The Seventh Circuit, in *Simer v. Rios*, 661 F.2d 655, 665 (7th Cir.1981), *cert. denied*, 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982), explained the proper method of analyzing "predomination" questions under Rule 23(b)(3):

> Our inquiry into the predomination analysis must take two steps. Our first focus must be on the substantive elements of plaintiffs' cause of action and inquire into the proof necessary for the various elements. Second, after examining the proof necessary we must inquire into the form that trial on these issues would take. At this point it also becomes necessary to examine the procedural devices and alternatives available in trying class actions. This discussion interfaces with many aspects of the issue of manageability ....

*Id*. at 672. To carry out this analysis, the Court must determine the substantive elements of plaintiff's claims, the proof necessary to establish those elements, and whether those elements may be tried in a common fashion. *Id*. *See also Id*. at 672-673. (resolution of the predominance question tends to focus on the form trial on the issues would take, with consideration of whether the action would be

manageable). "[T]he predominance criterion is far more demanding [than Rule 23(a)'s commonality requirement]." *Amchem Prods. V. Windsor*, 521 U.S. 591, 623-34, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Although the presence of common issues may satisfy the commonality requirement, predominance is not present unless those common issues outweigh individual questions. *Id*.

### 2. UCL and FAL Claims

#### a. Standing and Stating a Claim for Restitutionary Relief[46]

Plaintiff contends, in light of the holding in *Tobacco II*, class certification may proceed once the named plaintiff establishes statutory standing. To the extent that plaintiff is suggesting the Court's class certification analysis begins and ends with the question of standing, she is mistaken. Standing and stating a claim for restitutionary relief are not interchangeable concepts. The California Supreme Court has clearly spoken on the question of standing under the UCL and FAL. *See* Section IV.C.2, *supra*. Focusing on Proposition 64's "as a result of" language, the court concluded that the representative plaintiff (and only the representative plaintiff) "proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements." *Tobacco II*, 93 Cal. Rptr. 3d at 565. *See also Id*. at 580. Subsequently, the California Supreme Court revisited the issue of standing in

---

[46] With regard to the issues discussed in this case, the UCL and FAL contain materially identical provisions. Accordingly, case law interpreting these provisions is equally applicable to either statute. The remainder of the Court's discussion often references only the UCL (the bulk of the relevant decisions discuss only the UCL). Nonetheless, the Court's discussion is equally applicable to plaintiff's FAL claims.

UCL and FAL class actions and defined the type of economic injury necessary for purposes of establishing standing. See *Kwikset Corp. v. Superior Court*, 246 P.3d 877 (Cal. 2011). *See also* section IV.C.3., *supra*.

Proposition 64, *Tobacco II*, and *Kwikset*, did not alter or eliminate the substantive elements necessary to maintain a UCL or FAL claim or to establish entitlement to restitutionary relief. *See Tobacco II*, 207 P.3d at 30, 34-36, 38. *See also In re Steroid Hormone Product Cases*, 104 Cal. Rptr. 3d 329, 340 (Cal. Ct. App. 2010) (Proposition 64 did not alter the substantive law governing UCL claims); *Morgan v. AT & T Wireless Services, Inc.*, 99 Cal. Rptr. 3d 768 (Cal. Ct. App. 2009) (with the exception of standing Proposition 64 did not alter the UCL's substantive provisions, and thus pre-Proposition 64 case law is applicable); *Pfizer Inc. v. Superior Court*, 105 Cal. Rptr. 3d 795, 801-804 (although absent class members need not meet standing requirements, they still have to be entitled to restitution or injunctive relief in order to be included in the class). Nor did they eliminate the need to meet the federal requirements for class certification, including predominance.

In conducting its Rule 23(b)(3) analysis, the Court is concerned with the substantive elements necessary to maintain a claim and establish entitlement to restitutionary relief; not the elements necessary for establishing standing.

**b. Stating A Claim Under the UCL or FAL Requires a Showing of Conduct that was "Likely to Deceive"**

**i. Defining "Likely to Deceive"**

To state a claim under the UCL or FAL based on fraudulent conduct, a plaintiff has the burden of establishing that the complained of conduct was "likely to deceive" a reasonable consumer. *Tobacco II*, 207 P.3d at 29; *Paduano v. American Honda Motor Co., Inc.*, 88 Cal. Rptr. 3d 90, 127 (Cal. Ct. App. 2009); *Bardin v. Daimlerchrysler Corp.*, 39 Cal.Rptr.3d 634, 647 (Cal. Ct. App. 2006); *Lavie v. Procter & Gamble Co.*, 129 Cal. Rptr. 2d 486, 494 (Cal. Ct. App. 2003).[47] The "likely to deceive" standard "implies more than a mere possibility that the advertisement might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner. Rather, the phrase indicates that the ad is such that it is probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Id*. at 495.

**ii. When a "likely to Deceive" Presumption is Appropriate**

A representative plaintiff is not required to establish that unnamed class members were actually deceived or confused by the allegedly misleading conduct. *Fairbanks v. Farmers New World Life Ins. Co.,* 128 Cal. Rptr. 3d 888, 903-904 (Cal. Ct. App. 2011). "Nonetheless, a class action cannot proceed for a fraudulent

---

[47] The California Supreme Court has expressly stated that Proposition 64 did not alter this standard. *See Tobacco II*, 207 P.3d at 29. The "likely to deceive" standard is also applicable in FAL actions. *Pfizer Inc. v. Superior Court*, 105 Cal.Rptr.3d 795, 802-803 (Cal. Ct. App. 2010).

business practice under the UCL when it cannot be established that the defendant engaged in uniform conduct likely to mislead the entire class." *Id*. at 904. Specifically, a UCL class action may be denied where individual proof would be necessary to determine whether fraudulent representations were actually made to each class member and/or putative class members were not exposed to the same fraudulent representations. *See Id*. at 903-904; *Knapp v. At & T Wireless Services, Inc. supra,* 195 Cal. App. 4th at p. 944-945; *Kaldenbach, supra,* 178 Cal. App. 4th at p. 850.

In addition, class treatment may be inappropriate when class members were exposed to disparate information from various sources, regardless of uniform representations that were made. For example, in *Fairbanks v. Farmers New World Life Ins. Co*., 128 Cal. Rptr. 3d 888 (Cal. Ct. App. 2011), the plaintiff brought a claim against the defendant insurer for violation of the UCL "in connection with [the insurer's] marketing and sale of universal life insurance policies." *Id.* at 891. In affirming the trial court's class certification denial, the appellate court acknowledged that the language in putative class members' life insurance policies was "indisputably amenable to common proof." However, the court went on to state it would be "impossible to consider the language of the policies without considering the information conveyed by the [insurer's] agents in the process of selling them." *Id.* at 564. Because the information conveyed varied from agent to agent, the appellate court concluded that uniformity was lacking and a presumption as to "likely to deceive" was not appropriate. *See also Knapp*

*v. AT & T Wireless Services, Inc., supra*, 124 Cal. Rptr. 3d 565 (individual issues prevailed when many of the class members may have received information explaining the allegedly concealed fact); *Kaldenbach v. Mutual of Omaha Life Ins. Co.,* 100 Cal. Rptr. 3d 637, 651-652 (Cal. Ct. App. 2009) (whether alleged misrepresentations were "likely to deceive" not subject to common proof where evidence indicated that insurance policies were sold by independent insurance agents who were not required to adhere to a scripted sales presentation). *See also Stearns v. Ticketmaster Corp.*, 695 F.3d 1013, 1020 (9th Cir. 2011) (warning that predominance may be lacking in California UCL claims where no cohesion among class members exists "because they were exposed to quite disparate information from various representatives of the defendant.").[48]

Finally, a UCL class action cannot proceed if the question of materiality is not subject to common proof. *Id*. at 906. A misrepresentation is "material" if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Id*. *Quoting Kwikset Corp. v. Superior Court* 246 P.3d 877 (Cal. 2011).

---

[48] In *Stearns* the Ninth Circuit Court of Appeals, considering a UCL claim, stated, while class members are not required to prove individualized deception, reliance, and injury, the Court must consider whether disclosures to class members were made and, if so, whether such disclosures: (a) tend to defeat the claim that common conduct attributed to the defendant is likely to deceive the entire class, and (b) are so numerous and individualized that they defeat commonality.

In the instant case, plaintiff cannot establish conduct that was "likely to deceive" on a class-wide basis because uniformity is lacking and materiality is not subject to common proof.

### iii. Analysis - Uniformity

Plaintiff contends that uniformity is present because putative class members were allegedly exposed to the same fraudulent advertisements (Doc. 58 pp. 22-24). However, as discussed in section V.B., *supra*, determining whether putative class members were actually exposed to the complained of advertisements will require individual plaintiff-specific inquiries. Plaintiff's uniformity argument is also problematic because it ignores the fact that YAZ is available only by prescription.[49] Because YAZ is a prescription medication, the

---

[49] Plaintiff contends that contraceptives are a distinct form of medication in that the patient drives the decision-making process with the physician playing a relatively passive role (Doc. 58 pp. 20-21). As support for this argument, plaintiff cites to *Hill v. Searle Labs, Inc.*, 884 F.2d 1064 (8th Cir. 1989). In *Hill* the court considered whether the learned intermediary rule applied to prescription contraceptive intra uterine devices ("IUDs"). The learned intermediary rule is premised on the notion that before obtaining a prescription medication there is a significant interaction between doctor and patient. In *Hill*, the court refused to apply the learned intermediary rule to IUDs. The court reasoned that birth control is a "private matter" and, unlike other prescription drugs, a patient does not rely on the physician's judgment but decides for herself to use some form of birth control. The court also concluded that a physician typically "does not make an intervening, individualized medical judgment in the birth control decision." *Id.* at 1070-1071. First, in *Hill*, the Eighth Circuit was predicting whether Arkansas would adopt a learned intermediary exception for contraceptives. The *Hill* court's decision was later repudiated by the Supreme Court of Arkansas. *See West v. Searle & Co.*, 305 Ark. 33, 806 S.W.2d 608, 614 (Ark. 1991) (stating "we are convinced that the stated public policy reasons for the learned intermediary doctrine are present with respect to oral cont[r]aceptives"). *See also* Id. (after the patient makes an initial choice about birth control, the physician exercises "his

question of uniformity must consider representations made to each putative class member and her prescribing physician. *See Vioxx*, 103 Cal. Rptr. 3d 83, 97-98 (Cal. Ct. App. 2009) (considering whether misrepresentations were material to patients *and* prescribing physicians when evaluating whether CLRA and UCL claims involving prescription drug were subject to common proof). *See also Id.* at 100 ("Even if plaintiffs establish, class-wide, that Merck misrepresented the cardiovascular risks of Vioxx in a manner that was likely to deceive *plaintiffs and their prescribing physicians*, no plaintiff would be able to recover without first identifying a proper comparator drug...") (emphasis added).[50] In the instant case, there is no evidence of uniform misrepresentations and/or omissions to the putative class members' prescribing physicians.

---

medical judgment concerning the best method of contraception for his patient"). Second, the position taken by the court in *Hill* is the minority position. *See e.g., Humes v. Clinton*, 792 P.2d 1032, 139-1040 (Kan. 1990). Third, *Hill* is not controlling. Fourth, the Court does not agree that physicians do not make an independent, individualized medical judgment when prescribing birth control. Before prescribing any drug, a physician exercises his or her independent medical judgment to determine the medical propriety of a particular patient taking a particular drug. One inquiry the prudent physician must make, of course, is the patient's potential susceptibility to the risks of a drug's inherent side effects. Ultimately, the physician makes the final decision as to whether or not to prescribe a particular drug – even if the drug was originally requested by the patient, the patient has personal or private reasons for taking the drug, and/or the patient plays an active role in the prescription decision. A majority of courts have reached the same or similar conclusions with regard to prescription birth control. *See e.g., Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652 (1st Cir. 1981); *In re Norplant Contraceptive Products Liability Litigation*, 955 F. Supp. 700 (E.D. Tex. 1997) (Schell, C.J.); *Spychala v. G.D. Searle & Co.*, 705 F. Supp. 1024, 1032 (D.N.J.1988) (Barry, J.).

[50]    Although not directly addressed, the appellate court's reference to "plaintiffs and their prescribing physicians" indicates that representations made to the prescribing physician are a necessary consideration in the "likely to deceive" analysis in prescription drug cases.

Finally, even assuming putative class members and their prescribing physicians were exposed to the same alleged misrepresentations or omissions, the varied information conveyed by each prescribing physician to putative class members prevents a finding of uniformity. [51]  As discussed above, when putative class members have been exposed to disparate information, uniformity may be lacking, regardless of identical misrepresentations or omissions also made to the putative class members.   The California decisions discussing this principle typically involve an identical misrepresentation conveyed by a defendant and disparate information conveyed by a sales person at the time of purchase.  *See* section V.D.2.b.ii., *supra*.   The instant case presents a similar scenario. Obtaining a prescription drug necessarily involves a considerable interaction between the individual patient and his or her prescribing physician.   Like the cases discussed in section V.D.2.b.ii., *supra*, it is impossible to evaluate the defendant's allegedly misleading conduct without considering the information

---

[51]   Plaintiff criticizes defendant for failing to provide evidence that the determination of which oral contraceptive to prescribe involves an intensive and individualized medical assessment by the prescribing physician (Doc. 58 p. 27). It is not defendant's burden, however, to prove that class certification is improper. Plaintiff carries the burden of convincing the Court that class certification is appropriate.  Further, the record indicates that a number of factors are relevant to the decision to prescribe an oral contraceptive, including the amount and severity of symptoms, treatment options other than oral contraception, and the patient's medical history.  *See* section II.A., *supra* (discussing the varied needs of women seeking treatment for PMS, PMDD, or premenstrual symptoms, the fact that not all treatments will be successful for a particular patient, noting that some patients (including the class representative) have had a negative experience with certain types of oral contraceptives and/or find that certain types of oral contraceptives actually worsen premenstrual symptoms, and the availability of numerous treatment options other than oral contraceptive pills.

conveyed by the prescribing physician; such information may defeat the claim that the common conduct attributed to the defendant was likely to deceive the entire class.

Considering the individual questions that will be necessary to establish actual exposure, the failure to establish that prescribing physicians were exposed to the same alleged misrepresentations or omissions, and the disparate information conveyed by prescribing physicians during the prescription drug process, the Court finds that uniformity is lacking and that the "likely to deceive" standard is not subject to common proof.

### iv. Presumption as to Materiality

With regard to materiality, a number of patient-specific factors influence the decision to take and selection of an oral contraceptive. Further, in comparison to fraudulent advertising involving serious health risks or a product's legality, the subject of the allegedly false advertising campaign at issue in this case may not have been material to a large number of the putative class members. Without class-wide materiality, a presumption that the alleged misconduct was "likely to deceive" is not appropriate.

### c. Stating a Claim for Restitutionary Relief - Lost Money or Property Which "May Have Been Acquired" by Means of the Unfair Conduct

Although absent class members do not need to meet standing requirements in order for a class to be certified, they still have to be entitled to restitution or

injunctive relief in order to be included in the class. *Pfizer Inc. v. Superior* Court, 105 Cal. Rptr. 3d 795, 802-804 (Cal. Ct. App. 2010). Restitutionary relief is available "as may be necessary to restore to any person in interest any money or property, real or personal, which *may have been acquired* by means of such unfair competition." *Tobacco II*, 207 P.3d at p. 34; § 17203 (emphasis added).[52] Thus, in addition to showing conduct that is "likely to deceive," a party seeking restitutionary relief must establish the loss of money or property which "may have been acquired" by means of the deceptive conduct. § 17203.[53]

In *Tobacco II*, the California Supreme Court considered the "may have been acquired" standard for the purpose of evaluating the scope and application of the "as a result of" standard in the UCL's standing requirement. The court found that the "may have been acquired" standard is "patently less stringent" than the "as a result of" standard. *Tobacco II*, 207 P.3d at 35. The court also explained that the less stringent "may have been acquired" standard "has led courts [including the California Supreme Court] repeatedly and consistently to hold that relief under

---

[52] The remedy provision in the FAL is nearly identical to the remedy provision in the UCL. *See* § 17535. The two remedy provisions are to be interpreted in the same fashion. *Vioxx*, 103 Cal. Rptr. 3d at 96 n.15.

[53] Plaintiff's complaint purports to seek injunctive relief, however, plaintiff has not sought class certification on that basis under Rule 23(b)(2). Nor could plaintiff obtain certification on that basis, because her primary claim is monetary. *Lemon v. Int'l Union of Operating* Eng'rs, 216 F.3d 577, 580-81 (7th Cir. 2000). Moreover, as noted by defendants, there is nothing to enjoin: Bayer stopped using these commercials in 2008. *See Madrid v. Perot Systems Corp.*, 130 Cal. App. 4th 440, 465 (Cal. App. 2005) (injunctive relief unavailable where the complained of conduct has ceased and there is no threat that the misconduct to be enjoined is likely to be repeated in the future). Accordingly, the Court only considers the requirements for obtaining restitutionary relief.

the UCL is available without individualized proof of deception, reliance and injury."[54] Because the "as a result of" standard necessarily involves a showing of actual reliance, the court concluded, requiring absent class members to establish standing would "conflict with the language in section 17203 authorizing broader relief—the 'may have been acquired' language—and implicitly overrule a fundamental holding in our previous decisions [that restitutionary relief is available without individualized proof of deception, reliance, or injury]." *Id*.

Considering the above, it is evident that establishing entitlement to restitution under the UCL and FAL (1) requires something less than "as a result of" causation and (2) does not require a showing of reliance.[55] However, this does

---

[54] Notably, Proposition 64 did not "alter the substantive law governing whether a plaintiff is eligible for relief under the UCL or FAL," the court's observations relating to the same are informative. Tobacco *II*, 207 P.3d at 38-41. Therefore, pre-Proposition 64 case law remains relevant in evaluating the statutes' remedies provisions.

[55] Subsequent to *Tobacco II*, at least one California Appellate Court has denied class certification citing individual issues pertaining to reliance. *See e.g. Cohen v. DIRECTV, INC.*, 101 Cal. Rptr. 3d 37, 49 (Cal. Ct. App. 2009) (trial court's concern, that the alleged CLRA and UCL claims would involve factual issues pertaining to putative class members' reliance on allegedly false advertising, "was a proper criterion for the court's consideration" when examining commonality for purposes of certification). *See also Avritt v. Reliastar Life Ins. Co.* 615 F. 3d 1023, 1034 (8th Cir. 2010) ("Although the state of California's UCL jurisprudence is currently uncertain, there is reason to doubt that the holding in *Tobacco II* goes as far as the [plaintiffs] suggest, eliminating any need to show that unnamed class members relied on any misrepresentations or were actually injured.").However, the majority of post-*Tobacco II* California Appellate Court decisions indicate that reliance is not a requisite element for recovery under the UCL or FAL. *See e.g., In re Steroid Hormone Product Cases*, 104 Cal. Rptr. 3d 329 (Cal. Ct. App. 2010) (unnamed class members not required to establish reliance to obtain relief under the UCL)*; McAdams v. Monier, Inc.* 105 Cal. Rptr. 3d 704, 717 (Cal. Ct. App. 2010) ("Since individualized proof of reliance and injury is not required for non-representative class members, the issues of reliance and injury do not foreclose a

not mean that there are <u>no</u> substantive limits on absent class members seeking restitution under these statutes. As the California Appellate Court recently explained, while the "may have been acquired" language focuses on the defendant's conduct and is substantially less stringent than a reliance or "but for" causation test, it is not meaningless." *Sevidal*, 117 Cal. Rptr. 3d at 82.[56] Rather, the statutes' "may have been acquired" language indicates that, at a minimum, there must be "some connection between the defendant's alleged improper conduct and the unnamed class members who seek restitutionary relief." *Id*.

California Appellate Courts consistently hold that plaintiffs who were not exposed to the allegedly fraudulent business practice cannot meet the "may have been acquired" standard. *See e.g., Pfizer*, 105 Cal. Rptr. 3d at 804. *See also e.g., Davis-Miller v. Automobile Club of Southern Ca.*, 134 Cal. Rptr. 3d 551, 564-565 (Cal. Ct. App. 2011); *Sevidal v. Target Corp.*, 117 Cal. Rptr. 3d 66, 82-

---

UCL class action."); *In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83, 99 n.19 (Cal. Ct. App. 2009) (declining to consider individual issues of materiality/reliance in class certification analysis (but denying class certification based on individual issues pertaining to damages, stating "it is clear from Supreme Court authority that recovery in a UCL action is available in the absence of individual proof of deception, reliance, and injury"). *See also Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020-1021 (9th Cir. 2011) (district court erred in concluding that class members' "individualized proof of reliance and causation would be required" for liability under the California UCL because *Tobacco II* held otherwise) (quoting *In re Tobacco II Cases*, 46 Cal.4th 298 (2009)).

[56] *Accord In re Firearm Cases*, 24 Cal. Rptr. 3d 659, 674 (Cal. Ct. App. 2005) ("The UCL provisions are not so elastic as to stretch the imposition of liability to conduct that is not connected to the harm by causative evidence."); *In re Vioxx Class Cases* 103 Cal.Rptr.3d 83, 96 (Cal. Ct. App. 2009) (While the "may have been acquired" language of Business and Professions Code section 17203 is so broad as to allow restitution without individual proof of injury, it is not so broad as to allow recovery without any evidentiary support.") (internal citation omitted).

83 (Cal. Ct. App. 2010); *Cohen v. DIRECTV, INC., SUPRA,* 101 Cal. Rptr. 3d 37, 47-48 (Cal. Ct. App. 2009). The basis for concluding that such plaintiffs cannot meet the "may have been acquired" standard is that "there is absolutely no likelihood they were deceived by the alleged false or misleading advertising or promotional campaign." *Pfizer, Inc. v. Superior Court*, 105 Cal. Rptr. 3d 795, 804 (Cal. Ct. App. 2010). [57] Thus, even though recovery is available without individualized proof of deception, reliance, or injury, at minimum, putative class members must establish exposure to the allegedly fraudulent conduct. For reasons discussed in sections V.B. and V.D.2.b.3., *supra*, establishing exposure to "Balloons" and "Not Gonna Take It" will involve a number of individualized issues.

---

[57] A different result *might* be warranted if a particularly egregious and extensive misleading advertising campaign was in issue. *See Tobacco II*, (noting that, *for purposes of standing and when the plaintiff alleges exposure to a long-term ("decades-long") advertising campaign involving significant risks to one's health*, an allegation of reliance is not defeated merely because alternative information was available). *See also Pfizer Inc. v. Superior Court*, 105 Cal. Rptr. 3d 795, 803-804 (stating that the decades-long advertising campaign at issue in *Tobacco II*, stands in "stark contrast" to a six-month long allegedly misleading advertising campaign regarding the benefits of mouthwash); *Sevidal v. Target Corp.*, 117 Cal. Rptr. 3d 66, 83-84 (noting significant difference between an advertising campaign at issue in *Steroid Hormone Product Cases*, 104 Cal. Rptr. 3d 329 (Cal. Ct. App. 2010), which involved illegal sales and a failure to disclose product contained an illegal substance and advertising campaign that made false allegations about whether product was "Made in U.S.A."). The alleged omission in the instant case is more like the misleading campaigns at issue in *Pfizer and Sevidal* than the campaigns at issue in *Tobacco II* and *Steroid Hormone Product Cases*.

### d. The Existence of a Measurable Amount of Restitution

California courts have held that "in order to obtain class wide restitution under the UCL, plaintiffs must establish not only a misrepresentation that was likely to deceive but the *existence* of a 'measurable amount' of restitution supported by the evidence." *In re Vioxx Cases* 103 Cal. Rptr. 3d 83, 100-101 (Cal. Ct. App. 2009) ("*Vioxx*") (emphasis added).[58]  *See also Nelson v. Pearson Ford Co.*, 112 Cal. Rptr. 3d 607, 633 (Cal. Ct. App. 2010) ("While it may be that an order of restitution will also serve to deter future improper conduct, in the absence of a measurable loss [the UCL] does not allow the imposition of a monetary sanction merely to achieve this deterrent effect.") *quoting Day v. At & T Corp.*, 63 Cal. App. 4th 325, 339, 74 Cal. Rptr. 2d 55 (1988).  This is because, although "the 'may have been acquired' language of Business and Professions Code section 17203 is so broad as to allow restitution without individual proof of injury, it is not so broad as to allow recovery without any evidentiary support." *Vioxx*, 103 Cal. Rptr. 3d at 96.

---

[58]  It is important to distinguish between establishing the *existence* of lost money or property and establishing the *amount* of lost money or property.  Here, the Court's analysis is concerned with how the plaintiff will show the existence of restitution that is measurable (*i.e.* how will plaintiff and the putative class establish that they are entitled to restitution that is measurable).  Where plaintiff's allegations involve a claim of overpayment, the traditional method would be to show the difference in price between the product purchased and a viable comparator product.  Evidence that the viable comparator product was cheaper is the type of evidence that can be used to establish the existence of a measurable amount of money that can be restored to the plaintiff.  Calculating the amount of restitution is a separate question that typically, standing alone, does not preclude class certification.

Defendant contends that the proper measure of restitution is the difference between what the plaintiff paid and the value of what the plaintiff received. Defendant further contends that establishing the value of what was received will require identification of a viable comparator drug. If defendant's proposed measure of restitution applies, establishing the existence of a measurable amount of restitution would require identification of a viable, less-expensive comparator drug or drugs for plaintiff and the putative class members. *See Vioxx*, 103 Cal. Rptr. 3d at 96, 100-101. Plaintiff contends that the proper measure of restitution is the full purchase price (what plaintiff refers to as "restitutionary disgorgement"). Under plaintiff's proposal, there is no need to value what was received; the mere purchase of YAZ by plaintiff and putative class members would sufficiently establish the existence of a measurable amount of restitution.

In the instant case, plaintiff alleges that she (and the putative class members) purchased YAZ instead of a cheaper equally effective oral contraceptive because of the allegedly deceptive advertising campaign. Plaintiff's allegations put valuation at issue. *See In re Steroid Hormone Product Cases*, 104 Cal. Rptr. 3d 329, 340-341 (Cal. Ct. App. 2010) (noting that unlike *Vioxx*, where plaintiffs alleged they paid more for the product than it was worth, valuation was not in issue because plaintiffs alleged they would not have purchased the product at all had they known it contained illegal ingredients). *See also Vioxx*, 103 Cal. Rptr. 3d at 96, 100-101. Considering the plaintiff's allegations, the Court agrees that the proper measure of restitution would be the difference between what the

plaintiff paid and the value of what the plaintiff received. *See In re Steroid Hormone Product Cases*, 104 Cal. Rptr. 3d at 340-341; *Vioxx*, 103 Cal. Rptr. 3d at 96, 100-101. *See also Cortez v. Purolator Air Filtration Products Co.*, 999 P.2d 706, 713 (Cal. 2000) (describing restitution as "the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received"); *Colgan v. Leatherman Tool Group, Inc.,* 38 Cal. Rptr. 3d 36, 58-63 (discussing restitution under the UCL and FAL) (Cal. Ct. App. 2006).

Here, establishing a value for YAZ will require identification of a viable comparator drug or drugs for the plaintiff and putative class members. To the extent that such valuation is necessary, plaintiff contends that any generic oral contraceptive will suffice. Plaintiff, however, does not bother to identify an appropriate generic oral contraceptive or to fully develop this argument.[59] Further, the record indicates that any generic oral contraceptive would not be an appropriate comparator drug. *See* Section II.A. and Section II.G, *supra*. Indeed, plaintiff's testimony and medical records indicate that she was prescribed several different oral contraceptives to find one that would address her patient-specific needs and that did not worsen her premenstrual symptoms. *See* Section II.G., *supra*. Thus, even for plaintiff, any generic oral contraceptive is not an appropriate comparator drug. Without a valid, class-wide comparator drug,

---

[59] Plaintiff merely contends that because all oral contraceptives are 99% effective any generic oral contraceptive is sufficient.

establishing the existence of a measurable amount of restitution will turn on a number of patient-specific factors.  *See Vioxx*, 103 Cal. Rptr. 3d at 96, 100-101.[60]

### e.  Conclusion

For the reasons discussed above, individual issues predominate rendering class treatment inappropriate.

### 3.  CLRA and Fraudulent Concealment Claims

### a.  Substantive Elements

Plaintiff's fraudulent concealment claims and CLRA claims are substantially similar to her UCL and FAL claims.  However, unlike the UCL and FAL, these claims require a showing of reliance.[61]

Under California law, reliance may be inferred on a class wide basis when the allegations demonstrate that the alleged misrepresentations were both uniform and material.  *See Vioxx,* 103 Cal. Rptr. 3d at 97-99 (causation may be

---

[60]  The Court is not convinced by plaintiff's attempts to distinguish *Vioxx*.  While there are differences between *Vioxx* and the instant case, these differences do not establish that the court's reasoning with regard to prescription medications and restitutionary relief are wholly inapplicable.

[61]  An action for consumer fraud requires a showing of justifiable reliance and resulting damage.  *Small v. Fritz Cos., Inc.*, 30 Cal. 4th 167, 172 (Cal. 2003). *See also Gawara v. U.S. Brass Corp*., 63 Cal.App.4th 1341, 1351-52, 74 Cal. Rptr 2d 663  (plaintiff must "show actual reliance on a defendant's misrepresentations or omissions as a prerequisite to establishing fraud.") (1998).  A plaintiff can only recover under the CLRA if he or she suffers damage "as a result of" conduct forbidden by the statute.  Cal. Civ. Code § 1780(a).  Thus, plaintiffs in a CLRA action must "show not only that a defendant's conduct was deceptive but that the deception caused them harm."  *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 129 (2009).  Establishing reliance is imperative to showing that the plaintiff suffered damage "as a result of" conduct forbidden by the statute. *Id.*

inferred where representation was material); *Mirkin v. Wasserman,* 858 P.2d 568, 575 (Cal. 1993) ("What we did hold was that, *when the same material misrepresentations have actually been communicated to each member of a class,* an inference of reliance arises as to the entire class.") (emphasis in original); *Vasquez v. Superior Court*, 94 Cal. Rptr. 796 (Cal. 1971) (inference permitted upon showing of uniform material misrepresentation made directly to each class member). "A misrepresentation is judged to be 'material' if 'a reasonable [person] would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.' ..." *Engalla v. Permanente Medical Group, Inc.,* 15 Cal. 4th 843, 977 (Cal. 1997). *See also Mass. Mutual Life Ins.,* 119 Cal. Rptr. 2d 190, 197 (Cal. Ct. App. 2002) ("A misrepresentation of fact is material if it induced the plaintiff to alter his position to his detriment. Stated in terms of reliance, materiality means that without the misrepresentation, the plaintiff would not have acted as he did."). "[I]f the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action." *Vioxx,* 103 Cal. Rptr. 3d at 93.

### b. Analysis as to Class-Wide Presumption Regarding Reliance

For the reasons discussed in section V.D.2.b.iii., *supra,* the requirement of uniformity is not met. In addition, for many of the same reasons discussed in section V.D.2.b.iii., *supra*, the record does not permit an inference of materiality as to the entire class. With regard to materiality, the Court finds two California

Appellate Court decisions addressing CLRA claims to be instructive: (1) *In re Vioxx Class Cases* 103 Cal.Rptr.3d 83 (Cal. Ct. App. 2009) and (2) *Brown v. Regents of University of California*, 198 Cal. Rptr. 916 (Cal. Ct. App. 1984).

In *Vioxx*, the California Appellate Court found that CLRA claims relating to a failure to disclose risks associated with use of the prescription drug Vioxx were not subject to common proof because consumers differ in what they consider material.[62] In so holding, the Appellate Court noted that the cardiovascular risk associated with Vioxx only applied to certain patients, that some patients would have purchased Vioxx even if they had been aware of the risks, that some physicians would have prescribed Vioxx regardless of the risks, and that a number of factors influence a doctor's decision to prescribe a medication.[63]

In *Brown*, a class action was brought for fraud based on the claim that surgeons failed to disclose morbidity and mortality statistics for elective heart surgery. With regard to the question of materiality, the California Appellate Court held that class treatment was not appropriate considering (among other things) the wide variety of facts that influence a patient's decision to consent to surgery:

---

[62] Plaintiffs' CLRA class claims were premised on the defendant's failure to disclose cardiovascular risks associated with Vioxx, a prescription medication. Plaintiffs alleged that Vioxx was less safe, and no more effective, than a generic medication and that Vioxx was more expensive than that generic medication.

[63] *See also Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644 (1993) (materiality could not be presumed on a class-wide basis where class members would differ on whether orange juice's "fresh" and "no additives" labels would lead them to believe the orange juice was premium when the label also said "from concentrate").

> What may be appropriate to a determination of common issues in a relatively simple consumer fraud action, however, is entirely inappropriate when the alleged fraud relates to the decision to obtain heart surgery. Rather than dealing with straightforward issues such as the price of meat and life-expectancy of freezers, the court must grapple with complex issues relating to a patient's medical condition prior to surgery, the need for medical care and the extent of such care required by his condition, the variable nature of the dialogue between physician and patient, the surgical process itself, and postsurgical complications and care.

*Brown*, 198 Cal. Rptr. at 990.

Here, just as in *Vioxx* and *Brown*, a number of patient-specific factors influence the decision to select and take an oral contraceptive. Further, as defendants note, a number of consumers would have attached little or no weight to the allegedly fraudulent representations and omissions, including (1) women who did not suffer from PMS or premenstrual symptoms not severe enough to warrant a diagnosis of PMDD; (2) women who take an oral contraceptive for the sole purpose of birth control; (3) women who took YAZ based solely on their prescribing physician's independent medical judgment (notably plaintiff does not contend that the complained of advertisements deceived physicians); and (4) women who knew that YAZ was not approved for or proven effective in treating PMS or premenstrual symptoms not severe enough to warrant a diagnosis of PMDD. Considering the above, it is evident that materiality would differ from consumer to consumer and therefore an inference of reliance is not appropriate.

Without a presumption of reliance, plaintiff's CLRA and fraudulent concealment claims will require an individualized person-by-person evaluation of

numerous issues including (1) whether the putative class members were exposed to accurate information and/or knew that YAZ was not approved for or proven effective in treating PMS or premenstrual symptoms severe enough to warrant a diagnosis of PMDD; (2) the potential class members' understanding of the complained of advertisements; and (3) the potential class members' medical history and reasons for taking YAZ.

Thus, in the instant case it is evident that individual issues predominate over common issues. *See* Clark v. *Experian Information Solutions, Inc.* 256 Fed. Appx. 818 (7th Cir. 2007);[64] *Nagel v. ADM Investor Servs., Inc.*, 217 F.3d 436, 443 (7th Cir. 2000).

## E.  Analysis – Rule 23 Prerequisite of Sufficiently Definite Class

A class is overly broad and should not be certified if it includes a great many persons who could not have been injured by the defendant's conduct. *Kohen v. Pacific Inv. Management Co. LLC*, 571 F.3d 672, 677-678 (7th Cir. 2009).   When actual deception is required, class members who knew the truth could not have been injured by the defendant's conduct.  *See Oshana*, 472 F.3d 506, 513-514.  Here, the putative class indisputably includes women who did not rely on and were not deceived by the alleged omission.  This includes women who (1) were told by their healthcare provider that YAZ was not indicated to treat PMS or pre-menstrual symptoms and (2) who were exposed to and understood YAZ

---

[64]  Though Clark is an "unpublished" decision, the Court appropriately relies on it because it was decided in November 2007, after the effective date of Fed. R. App. P. 32.1(a).

literature or other advertisements stating that YAZ was not indicated to treat PMS or pre-menstrual symptoms. These women took YAZ *even though* it was not approved for or proven effective in treating PMS or pre-menstrual symptoms not severe enough to warrant a diagnosis of PMDD. Accordingly, with respect to plaintiff's CLRA and fraudulent concealment claims, the putative class is overly broad.[65]

The putative class is also overly broad with regard to plaintiff's UCL and FAL claims. As discussed in section V.D.2.b.iv., *supra*, the putative class includes a great many women for whom the subject of the allegedly false advertising campaign was not material. Plaintiff contends that because a large percentage of women suffer from PMS or premenstrual symptoms, the alleged misrepresentations and/or omissions were necessarily material. However, the record indicates that a majority of women who suffer from PMS or premenstrual symptoms feel that their symptoms are relatively mild and do not require medical

---

[65]  Defendant also contends that the putative class is overly broad because it includes women who received successful and beneficial treatment. In assessing whether a class is overly broad, the Seventh Circuit has been careful to distinguish between those who were *not* harmed and those who *could not* have been harmed by the complained of conduct. *See Messner v. Northshore University HealthSystem*, -- F.3d --, 2012 WL 129991, *15-*18 (7th Cir. 2012). It is evident that class members who knew YAZ was not indicated to treat PMS or premenstrual symptoms not severe enough to warrant a diagnosis of PMDD could not have been harmed by the complained of conduct. However, putative class members who received successful and beneficial treatment seem to fall into the category of consumers who could have been harmed but ultimately were not harmed by the complained of conduct. Thus, in assessing whether the class is overly broad, the Court does not consider these putative class members. *See Id*. at *16 (discussing "class members who could have been harmed, but arguably might not have been for one reason or another").

treatment.  *See* section II.A., *supra*.  This defeats the contention that a majority of putative class members would find representations pertaining to the treatment of PMS or premenstrual symptoms to be material.

## VI. CONCLUSION

Having considered the parties briefs and the relevant authority the Court finds that plaintiff cannot meet all of the requirements of Class Certification. Accordingly, for the reasons discussed herein, the Court **DENIES** plaintiff's motion for class certification and **STRIKES** the class allegations in plaintiff's second amended complaint.  Plaintiff's motion to strike certain of defendant's exhibits is denied as moot.

**SO ORDERED.**

David R. Herndon
2012.03.13
09:48:51 -05'00'

**Chief Judge**                                        **Date: March 13, 2012**
**United States District Court**